**COLORADO WATER CONSERVATION BOARD, Objector/Appellant/Cross–Appellee.**

v.

**CITY OF CENTRAL,**
**Applicant/Appellee/Cross–Appellant,**

and

**City and County of Denver, acting by and through its Board of Water Commissioners; City of Arvada; City of Black Hawk; City of Thornton; City of Westminster; City of Northglenn; Board of County Commissioners of Gilpin Coun-**

ty; Lookout Mountain Water District; Missouri Lakes Recreation and Improvement Association, Inc.; Coors Brewing Company; Wannamaker Ditch Company; Consolidated Mutual Water Company; Agricultural Ditch and Reservoir Company and Golden Canal and Reservoir Company; Farmers Reservoir and Irrigation Company; and the State Engineer and Division Engineer for Water Division No. 1, Objectors/Appellees/Cross–Appellees.

No. 04SA145.

Supreme Court of Colorado,
En Banc.

Nov. 28, 2005.

John W. Suthers, Attorney General, John J. Cyran, Assistant Attorney General, Water Rights Unit, Natural Resources and Environment Section, Denver, for the Colorado Water Conservation Board.

Law Office of Stephen T. Williamson, Stephen T. Williamson, Matthew Machado, Louisville, for the City of Central.

John W. Suthers, Attorney General, Alexandra L. Davis, Assistant Attorney General, Water Rights Unit, Natural Resources and Environment Section, Denver, for the State and Division Engineers for Water Division 1.

Casey S. Funk, Patricia L. Wells, Michael L. Walker, Denver, for the City & County of Denver, acting by and through its Board of Water Commissioners.

Trout Unlimited, Andrew Peternell, Boulder, for Amicus Curiae Trout Unlimited.

Porzak, Browning & Bushong LLP, Glenn E. Porzak, Kevin J. Kinnear, Boulder, for Amici Curiae the City of Golden, the Upper Eagle Regional Water Authority, the Eagle River Water & Sanitation District, Wildcat Ranch Association, and the Eagle Park Reservoir Company.

Friedlob Sanderson Paulson & Tourtillott, LLC, Brian M. Nazarenus, Carolyn F. Burr, William H. Caile, Denver, for Amicus Curiae Public Service Company of Colorado, d/b/a/ Xcel Energy Corp.

Trout, Witwer & Freeman, P.C., Douglas M. Sinor, Lisa M. Thompson, Denver, for Amicus Curiae the Northern Colorado Water Conservancy District.

City of Boulder, Ariel Calonne, City Attorney, Sue Ellen Harrison, Assistant City Attorney, Boulder, for Amicus Curiae City of Boulder.

Gilbert Y. Marchand, Jr., P.C., Gilbert Y. Marchand, Jr., Boulder, for Amicus Curiae Centennial Water & Sanitation District.

Burns, Figa & Will, P.C., Lee E. Miller, Stephen H. Leonhardt, David M. Pittinos, Englewood, for Amici Curiae Southeastern Colorado Water Conservancy District.

Colorado River Water Conservation District, Peter C. Fleming, Glenwood Springs, for Amicus Curiae Colorado River Water Conservation District.

Balcomb & Green, P.C., David C. Hallford, Christopher L. Geiger, Glenwood Springs, for Amicus Curiae Basalt Water Conservancy District.

Leavenworth & Karp, P.C., Loyal E. Leavenworth, Glenwood Springs, for Amici Curiae Mid Valley Metropolitan District and Town of New Castle.

Hill, Kinney & Wood, LLC, Tom Kinney, Carbondale, for Amicus Curiae Town of Basalt.

Olszewski & Massih, P.C., Edward B. Olszewski, Glenwood Springs, for Amicus Curiae West Divide Water Conservancy District.

Lind, Lawrence & Ottenhoff LLP, Kim R. Lawrence, Kelly J. Custer, Greeley, for Amicus Curiae Central Colorado Water Conservancy District.

Law Office of Stephen T. Williamson, Stephen T. Williamson, Matthew Machado, Louisville, for Amicus Curiae the Arapahoe County Water and Wastewater Authority.

MARTINEZ, Justice.

In this water rights dispute, we consider whether, pursuant to section 37–92–305, C.R.S. (2005), a plan for augmentation must include terms and conditions to protect an instream flow right against injury caused by out-of-priority diversions, including diversions made from points associated with senior water rights.

Applicant–Appellee, the City of Central ("Central"), filed an application with the District Court, Water Division No. 1, for a change of water rights, approval of a plan for augmentation, and an adjudication of an appropriative right of substitution and exchange. Central sought an August 1, 1992 priority date[1] for its exchange, located on the North Clear Creek Basin. To protect its 1987 North Clear Creek instream flow water right from injury under Central's plan for augmentation and exchange, Objector–Appellant, the Colorado Water Conservation Board (the "Board"), filed a Statement of Opposition with the water court seeking protective terms and conditions. The parties subsequently filed cross motions for Determinations of Law under C.R.C.P. 56(h) to determine whether the Board could impose terms and conditions to protect its instream flow right from injury under Central's augmentation plan. The water court concluded the Board could not impose terms and conditions on Central's plan for augmentation to prevent injury to its instream flow right. It also assigned Central's exchange a priority date of December 31, 1992, the date on which Central filed its application. The Board appeals from the water court's Amended Order, which held that an applicant for an augmentation plan is not obligated to protect all existing vested water users from reduced streamflow. Central cross-appeals the water court's assignment of a December 31, 1992 priority date to its exchange.

We reverse the water court's determination of law that a plan for augmentation covering depletions from out-of-priority diversions is not required to provide replacement water above the reach of a junior in-

---

1. Central originally requested a February 5, 1992 priority date for its exchange. Central later changed the priority date it sought to August 1, 1992.

stream flow right. We affirm the water court's award of a December 31, 1992 priority date to Central's appropriative right of exchange on the North Clear Creek Basin.

## I. Background

### A. Central's Water System

Central owns a number of water rights that divert water from the North Clear Creek Basin, a tributary of the Clear Creek Basin. Central's existing decreed water rights include: Miners Gulch Ditch, Pecks Gulch, Tascher Ranch Line, Toimby Ranch Feeder, Wilson Ranch Feeder, the Hole–in–the–Ground Reservoir, Central City Water Reservoir, James Peak Reservoir, and Echo Lake Reservoir.

To meet its future water demands, Central sought to upgrade its raw water system. Central's plan was two-fold: (1) upgrade its raw water system facilities; and (2) obtain four new water rights. The facilities upgrade involved enlargement of a diversion structure, construction of a new diversion structure, and enlargement of a reservoir.

Central filed four applications with the Division 1 Water Court ("water court") to adjudicate new water rights, a change of use of water rights, exchanges, and an augmentation plan necessary to supply raw water to Central's customers: (1) Case No. 91CW125, a December 1991 application seeking conditional direct flow and storage water rights from North Clear Creek and several of its tributaries; (2) Case No. 92CW168, a December 1992 application for a change of use of nine shares of the Farmers High Line Canal, a mutual ditch company; change of use of its four inches of Wannamaker Ditch Company water rights; approval of a plan for augmentation; and adjudication of appropriative rights of substitution and exchange; (3) Case No. 94CW063, an application for conditional direct flow and storage water rights from Fall River; and (4) Case No. 96CW1032, an application for direct flow and storage rights from two springs near Chase Gulch Reservoir. Central subsequently amended each of these applications.

The Board appeals the Decree and Amended Order in Case No. 92CW168, which involves a change of water rights, a plan for augmentation, and an exchange. Central filed an application for a change of use of its 9.0 shares in the Farmers High Line Canal and 4.0 inches decreed to the Wannamaker Ditch Company. These two water rights are located near Golden, downstream from Miners and Pecks Gulch. The water rights are to be changed from irrigation use to municipal use within the present and future service area of Central.

The application and the subsequent amendments to the application seek to exchange these changed use rights from the Farmers High Line Canal augmentation station and Wannamaker Ditch augmentation station to Central's various points of upstream diversion, including: (1) the existing Central City Pipeline intakes at Miners, Pecks, and Broomfield Gulches, (2) the proposed North Clear Creek Pumping Pipeline, (3) the proposed Fall River Pumping Pipeline, (4) Chase Gulch Spring Nos. 1 and 2, and (5) various reservoirs including Dorothy Lee Placer Reservoir, Chase Gulch Reservoir and enlargement, and Hole–in–the–Ground Reservoir. The application requests an exchange at a maximum rate of 4.1 cubic feet per second (c.f.s.) with an appropriation date of August 1, 1992. The exchange reach extends from the two augmentation stations as the downstream terminus to the points of diversion and storage as the upstream terminus.

The application and subsequent amendments to the application in Case No. 92CW168 also requested approval of a plan for augmentation. Under this augmentation plan, Central would be allowed to divert water at times when its existing junior water rights and those claims filed in 91CW125, 94CW063, or 96CW1032 are out of priority and diversions would otherwise be curtailed. Three wells owned by the Gilpin County School District, two wells owned by the Gilpin County Justice Center, as well as four facilities owned by Albert Frei & Sons are also included as water rights to be augmented in the plan for augmentation. The Farmers High Line Canal and Wannamaker Ditch water rights and reusable effluent from the Blackhawk–Central City Wastewater Treat-

ment Plants would be used to replace out-of-priority depletions caused by these diversions.

In sum, the exchange to points of diversion from the Farmers High Line Canal and Wannamaker Augmentation Stations and Black Hawk–Central City Sanitation District Wastewater Treatment Plant are: Miners Gulch CCPL, Broomfield Gulch CCPL, Pecks Gulch CCPL, North Clear Creek Pumping Pipeline, Chase Gulch Reservoir and Enlargement, Fall River Pumping Pipeline, and Hole–in–the–Ground Reservoir. The water rights and structures to be augmented are: Miners Gulch CCPL, Broomfield Gulch CCPL, Pecks Gulch CCPL, North Clear Creek Pumping Pipeline, Chase Gulch Reservoir, Chase Gulch Reservoir Enlargement, Fall River Pumping Pipeline, Hole–in–the–Ground Reservoir, Chase Gulch Spring No. 1, Chase Gulch Spring No. 2, Central City Water Reservoir, Tascher Ranch Line, Toimby Ranch Line, and Wilson Ranch Feeder. Other water rights to be augmented include the three Gilpin County School District Wells.

The parties focus their arguments on three of Central's existing decreed water rights: Miners Gulch Ditch, a direct flow right with an appropriation date of 1903; Pecks Gulch, a direct flow right with an appropriation date of 1876; and three wells operated by Central for, and owned by, the Gilpin County School District with appropriation dates of 1978.

## B. The Board's Instream Flow Right

The Board owns a 1.5 c.f.s. instream flow right with a 1987 priority date. This instream flow right is located on North Clear Creek, downstream from Central's proposed out-of-priority diversions, but located upstream from Central's proposed replacement sources, the Farmers High Line Canal and the Wannamaker Ditch. The Board's instream flow right, which was decreed for preserving the environment to a reasonable degree, runs from the confluence of North Clear Creek and Pine Gulch, as the upstream terminus, to the confluence of North Clear Creek and Chase Gulch, as the downstream terminus.

Central's Miners Gulch, Pecks Gulch, and Gilpin County School Wells are thus senior to the Board's instream flow right. Therefore, when operating in priority, the Board's instream flow right suffers no legal injury. Central's Pecks Gulch decree is a fairly senior decree in the Clear Creek Basin. However, its Miners Gulch Ditch right is fairly junior in the Clear Creek Basin. The Tascher Ranch Line, Toimby Ranch Pipeline, and Wilson Ranch Feeder Pipeline are also fairly senior rights with December 31, 1876 appropriation dates. During times of a downstream senior call—whether a call on Pecks Gulch or Miners Gulch—curtailment of Central's water rights results in additional water being available to satisfy the Board's·instream flow right. That is, the Board's right is typically satisfied when Central's upstream senior rights are curtailed by a call from a downstream senior.

As discussed above, Central requests approval of a plan for augmentation to divert water when its existing water rights at certain points of diversion, as well as points of diversion claimed in Case Nos. 91CW125, 94CW063, and 96CW1032, are out of priority and diversions would otherwise be curtailed. Three wells owned by the Gilpin County School District, two wells owned by the Gilpin County Justice Center, and four facilities owned by Albert Frei & Sons are also included as points of diversions to be augmented. A number of these points divert water tributary to that reach of the North Clear Creek between Broomfield Gulch and Chase Gulch where the Board has its decreed instream flow right. The water rights associated with these points of diversion include rights both senior and junior to the Board's North Clear Creek instream ·flow right. All of these rights, however, have been at times subject to downstream calls, thus necessitating Central's proposed plan for augmentation. Central's diversions of its North Clear Creek rights, whether operating in or out of priority, reduce the amount of water available to the Board's instream flow right.

## C. Instant Litigation

The Board opposed Central's application in Case No. 92CW168. Based on the possibility

that Central's out-of-priority diversions would reduce the amount of water historically available to the Board's instream flow right, the Board requested Central "include in its plan terms and conditions prohibiting Central from making out-of-priority diversions from points tributary to North Clear Creek at times the Board's instream flow right is not met."

Central conceded the Board's instream flow right would be senior to the direct flow and storage water rights adjudicated in Case No. 91CW125 ("1991 water rights"), as well as the exchange adjudicated in Case No. 92CW168 ("1992 Exchange"). Accordingly, the Board's proposed decree subordinated its 1991 water rights and 1992 Exchange to the Board's 1987 instream right. Specifically, the proposed decree provided that, if any of the junior claims by Central physically impacted the minimum stream flow reach and the minimum stream flow decree was not satisfied, the 1991 water rights and the 1992 Exchange would either be curtailed or Central would be required to provide supplies at or above the point of depletion into the North Clear Creek drainage:

> *Terms and Conditions to Prevent Injury to the [Board's] Instream Flow Water Right Decreed in Case No. 87CW273.* As a term and condition of this decree, applicant has acknowledged that the [Board's] instream flow ("ISF") water right on North Clear Creek in the amount of 1.5 c.f.s., which was adjudicated in Case No. 87CW273 with an appropriation date of December 11, 1987, is senior in priority to certain of applicant's water rights that divert from the 87CW273 ISF segment or upstream from said ISF segment. For purposes of this paragraph only, such water rights are collectively referred to as "Applicant's Junior Water Rights." *Applicant's Junior Water Rights are:* (1) the *appropriative rights of substitution and exchange* in the amount of 4.1 c.f.s. that are diverted from the ISF segment or upstream from said ISF segment; and (2) the direct flow and storage water rights

adjudicated in Case No. 91CW125, to the extent said rights divert or will be diverted from the ISF segment or upstream from said ISF segment. *Applicant's Junior Water Rights do not include applicant's water rights adjudicated in Cases No. CA 41340 and W–117–70*[2] .... Accordingly, the following terms and conditions are imposed to prevent injury to said ISF water right:

> 66.1 Applicant shall not divert water under Applicant's Junior Water Rights from the North Clear Creek Pumping Pipeline, Peck's Gulch Diversion Facility, Broomfield Gulch Diversion Facility or Miner's Gulch Diversion Facility, *including such diversions by augmentation and exchange*, unless 1.5 c.f.s is available in North Clear Creek for the ISF water right decreed in Case No. 87CW273.

Thus, Central agreed to subordinate the 1992 Exchange to the Board's instream flow right. Central did not agree, however, to subordinate its proposed out-of-priority diversion points associated with water rights senior to the Board's right, including Miners Gulch, Pecks Gulch, and the three Gilpin County School Wells.

The Board subsequently filed a Motion for Determination of a Question of Law under C.R.C.P. Rule 56(h) seeking a ruling concerning the following question of law:

> Whether [Central's] plan for augmentation must include terms and conditions protecting the [Board's] North Clear Creek water rights against injury caused by all out-of-priority diversions, including diversions made from points associated with senior water rights that have been curtailed due to downstream calls.

Central also filed a Motion for Determination of Law seeking a ruling concerning two related questions of law:

> Whether, pursuant to C.R.S. § 37–92–305(8), a plan for augmentation is sufficient as a matter of law to allow out-of-priority diversions to the extent that the applicant

---

**2.** Central's rights adjudicated in Case No. CA 41340 include Tascher Ranch Line, Toimby Ranch Feeder, Wilson Ranch Feeder, Miners Gulch Ditch, Pecks Gulch, and Central City Water Reservoir. Central's right adjudicated in W–117–70 is its Hole–in–the–Ground Reservoir right, a storage right with a 1970 priority date.

provides replacement water necessary to meet the lawful requirements of a senior diverter at the time and location and to the extent the senior would be deprived of his or her lawful entitlement by the applicant's diversion.

Whether out-of-priority diversions pursuant to water rights in the plan that are senior in priority to the [Board's] instream flow right do not injure said instream flow right as a matter of law. And further, whether such decreed structures may continue to divert while providing substitute supplies as against downstream senior calls without providing substitute supplies to the junior [Board] instream right because the plan for augmentation has no priority date and said structures are entitled to assert their decreed priorities while operating within the plan.

The Board advanced two arguments. First, the Board argued that, under section 37–92–305 of the Water Right Determination and Administration Act of 1969, any out-of-priority diversions made by Central under its proposed plan for augmentation from a diversion point where all senior rights have been curtailed may not be considered a diversion under a "senior" priority. Rather, the Board argued, such a diversion must be considered an out-of-priority diversion made pursuant to a plan for augmentation. Consistent with Colorado statutory law, the Board asserted, all depletions made pursuant to this diversion must be replaced so as to prevent any injury to any vested water rights. Second, the Board contended Central is not entitled to change stream conditions to the detriment of junior appropriators by making out-of-priority diversions from rights that should be, and historically have been, curtailed. The Board maintained in subsequent filings that, because Central's proposed plan would provide replacement water to the stream system downstream of its diversion structures, Central's application included as an element of its augmentation plan a claimed appropriative right of exchange. Consequently, the Board argued the priority date for out-of-priority diversions or exchanged water is the appropriation date of Central's claimed exchange—a date junior to that of the Board's

right—not the priorities associated with Central's existing rights.

In contrast, Central asserted that no element of exchange through the North Clear Creek instream flow segment was or ever had been included in the plan for augmentation. Rather, Central maintained its exchange was separate from the augmentation plan. In this regard, Central noted that the proposed decree it submitted would prevent the operation of its exchange through the North Clear Creek instream flow segment when Central's exchange is not in priority. Further, Central observed that, while an augmentation plan may involve changes of water rights, its augmentation plan did not.

With regard to proposed out-of-priority diversions associated with its senior water rights under the augmentation plan, Central maintained that section 37–92–305 required substitute supplies only for senior water rights. Substitute supplies, it posited, are provided as an alternative to curtailment, but curtailment could only be administered where a senior called for water. Central argued any physical injury, such as diminished supply in the instream flow reach, was not legal injury because it viewed the Board's instream flow right as junior to its proposed diversion points.

In sum, the parties agreed that Central's 1991 water rights and the 1992 Exchange would be subordinate to the Board's instream flow right. The parties disagreed as to whether Central's augmentation plan included an exchange that simultaneously subordinated the augmentation plan and whether Central's augmentation plan could injure the Board's instream flow right in law or in fact.

The water court deferred ruling on the motions until after trial. At trial, the Board focused on Central's proposed out-of-priority diversions at Miners Gulch, Pecks Gulch, and the Gilpin County School Wells. To this end, the Board introduced injury testimony through Bahmant Hatami, the Board's water engineer. Hatami testified that Central's proposed plan for augmentation would permit Central to divert downstream augmentation water from upstream North Clear Creek diversion points located on Miners Gulch and Pecks Gulch, or at times Central would oth-

erwise not be legally entitled to divert from its North Clear Creek diversion points because of a downstream call. Hatami stated that these out-of-priority diversions would enlarge the amount of water available to Central. Hatami testified that these out-of-priority diversions would reduce the amount of water available in North Clear Creek and thus reduce the amount of water available to satisfy the Board's North Clear Creek instream flow right.

Hatami further asserted that out-of-priority diversions of downstream augmentation water from the Gilpin County School Wells would similarly reduce the amount of water available to satisfy the Board's North Clear Creek instream flow right. Hatami testified that lagged depletions from out-of-priority well diversions could further reduce the amount of water available to the Board's instream flow rights.

Finally, Hatami testified that, based on the evidence that Central's plan for augmentation would enlarge the amount of water diverted by Central from North Clear Creek and reduce the amount of water available to the Board, Central's plan for augmentation must include specific terms and conditions to prevent Central's new diversions from injuring the Board's North Clear Creek instream flow right. Hatami proposed terms and conditions he believed sufficient to protect the Board's right. Specifically, Hatami proposed that Central's senior water rights be defined as junior when diverting out of priority and added a provision regarding the Gilpin County School Wells:

*Terms and Conditions to Prevent Injury to the [Board's] Instream Flow Water Right Decreed in Case No. 87CW273.* As a term and condition of this decree, applicant has acknowledged that the [Board's] instream flow ("ISF") water right on North Clear Creek in the amount of 1.5 c.f.s., which was adjudicated in Case No. 87CW273 with an appropriation date of December 11, 1987, is senior in priority to certain of applicant's water rights that divert from the 87CW273 ISF segment or upstream from said ISF segment. For purposes of this paragraph only, such water rights are collectively referred to as

"Applicant's Junior Water Rights." APPLICANT'S JUNIOR WATER RIGHTS ARE: (1) the appropriative rights of substitution and exchange in the amount of 4.1 c.f.s. that are diverted from the ISF segment or upstream from said ISF segment; (2) the direct flow and storage water rights adjudicated in Case No. 91CW125, to the extent said rights divert or will be diverted from the ISF segment or upstream from said ISF segment; AND (3) APPLICANT'S WATER RIGHTS ADJUDICATED IN CASES NO. CA 41340 AND W-117–70 THAT DIVERT FROM THE 87CW273 ISF SEGMENT OR UPSTREAM FROM SAID ISF SEGMENT, TO THE EXTENT THAT THESE WATER RIGHTS ARE MAKING OUT-OF-PRIORITY DIVERSIONS PURSUANT TO THIS AUGMENTATION PLAN.... Accordingly, the following terms and conditions are imposed to prevent injury to said ISF water right:

66.1 Applicant shall not divert water under Applicant's Junior Water Rights from the North Clear Creek Pumping Pipeline, Peck's Gulch Diversion Facility, Broomfield Gulch Diversion Facility or Miner's Gulch Diversion Facility, including such diversions by augmentation and exchange, unless 1.5 c.f.s is available in North Clear Creek for the ISF water right decreed in Case No. 87CW273.

66.1.5 WHEN THE [BOARD'S] INSTREAM FLOW WATER RIGHT FOR NORTH CLEAR CREEK, AS DECREED IN CASE NO. [87CW273], IS NOT SATISFIED APPLICANT SHALL AUGMENT ITS DEPLETIONS FROM THE GILPIN COUNTY SCHOOL DISTRICTS WELLS, IDENTIFIED IN TABLE 9, IN TIME, PLACE, AND AMOUNT.

(Emphasis added.)

Central argued the Board could not be injured in law and presented testimony that the Board would not be injured in fact. Its water engineer, Dan Ault, testified that, once the flow in Miners Gulch reaches approximately 0.15 c.f.s.—or approximately sixty-seven gallons per minute—the Board's instream flow right on North Clear Creek is

satisfied. Central presented testimony and evidence at trial that (1) the historical Miners Gulch diversion continually diverted all of the water that was available up to its capacity for approximately the last one hundred years; (2) the relevant flow greatly exceeded sixty-seven gallons per minute; and (3) the water so diverted bypassed the instream flow segment on North Clear Creek entirely.

In addition, Central presented evidence that its senior water rights on North Clear Creek were never curtailed, at least prior to the filing of the application in Case No. 92CW168, because the North Clear Creek Basin was unadministered.

Central also presented testimony regarding the Gilpin County School Wells. The decrees for the senior Gilpin County School Wells contained flow rate limitations. Under Central's plan for augmentation, the flow rates originally decreed to these wells could not be increased pursuant to agreement. Thus, Central asserted, the Board never appropriated this water.

Finally, Central argued the 4.1 c.f.s. exchange cannot injure the Board's instream flow right: Central's exchange will be administered within the priority system with a priority date to be awarded by the court, and the proposed decree expressly recognizes the seniority of the Board's North Clear Creek ISF.

On April 2, 2004, the water court issued a signed and amended order regarding the parties' motions for determination of questions of law. The water court located the injury standard for augmentation plans in the second sentence of section 37–92–305(8), C.R.S. (2005), noting that it provided "the injury standard by which the court must operate." This sentence provides that an augmentation plan is sufficient if it replaces water necessary to meet the requirement of a senior right:

A plan for augmentation shall be sufficient to permit the continuation of diversions when curtailment would otherwise be required to meet a *valid senior call* for water, to the extent that the applicant shall provide replacement water necessary to meet the lawful requirements of a *senior diverter* at the time and location and to the extent the *senior* would be deprived of his or her lawful entitlement by the applicant's diversion.

(Emphasis added.)

Based on this subsection, the water court concluded in its Amended Order that, under section 37–92–305

a plan for augmentation that covers depletions resulting from out-of-priority diversions by decreed priorities is [not] required to provide replacement water above the headgate or reach of an instream flow junior right to protect the junior right from the reduced water levels resulting from the out-of-priority diversions.

On May 20, 2004, the water court issued its Corrected Findings of Fact, Conclusions of Law, Judgment and Decree of the Water Court (the "Decree"), which incorporated the legal conclusions reached by the court in its April 2, 2004 Amended Order. In this Decree, it adopted Central's proposed "Terms and Conditions for the Plan for Augmentation" to prevent injury to the Board's instream flow water right, including the requirement that Central not divert by its 1992 Exchange unless 1.5. c.f.s. is available to the Board. The water court did not adopt the Board's proposed amendments to the Decree, namely, that Central's junior rights be defined to include out-of-priority diversions associated with senior rights and that depletions from the Gilpin County School Wells be augmented when the Board's instream flow was not met.

Because the water court determined the Board was not entitled to have protective terms and conditions imposed as a matter of law, it did not determine whether the Board could be injured in fact by Central's plan for augmentation. The water court assigned Central's exchange a priority date of December 31, 1992.

The Board appeals the legal conclusions reached by the water court in its Amended Order and its incorporation of those legal conclusions into the Decree. Central cross-appeals the priority date the water court assigned to the exchange.

## II. Appeal

The Board argues the water court incorrectly determined that section 37–92–305 does not require Central to include in its plan for augmentation terms and conditions protecting the Board's instream flow rights. In this regard, the parties reiterate their Rule 56(h) arguments. First, the Board asserts section 37–92–305 requires Central to replace any out-of-priority depletions made under its augmentation plan to prevent injury to its instream flow right. Central argues section 37–92–305 does not require it to replace depletions associated with its augmentation plan that affect the instream flow because the instream flow is not a senior right. Second, the Board argues Central's plan for augmentation includes the exchange and therefore the augmentation plan can operate only when the exchange is in priority. Central counters that its plan for augmentation is independent from the exchange and it may divert under its plan for augmentation, consistent with its senior priority dates, without regard to the Board's instream flow right.

Matters of statutory interpretation are matters of law subject to de novo review. *Fogg v. Macaluso*, 892 P.2d 271, 273 (Colo. 1995). This court's "primary objective is to ascertain and give effect to the purposes of which the General Assembly enacted a particular provision." *State Eng'r v. Castle Meadows, Inc.*, 856 P.2d 496, 504 (Colo.1993) (internal citations omitted). To determine legislative intent, "we look first to the language of the statute and apply its plain and ordinary meaning, if possible. We read the statutory provision as a whole and construe its terms harmoniously when we can, reconciling conflicts if necessary." *Bd. of Dir., Metro Wastewater Reclamation Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 105 P.3d 653, 657 (Colo.2005). "When the General Assembly chooses to legislate, it is presumed to be aware of its own enactments and existing case law precedent." *Anderson v. Longmont Toyota, Inc.*, 102 P.3d 323, 330 (Colo.2004).

At the crux of this issue is the injury standard set forth in section 37–92–305 for augmentation plans affecting instream flow rights. We first discuss basic principles of water law and the Water Right Determination and Administration Act, §§ 37–92–101 to –602, C.R.S. (2005), the governing statutory scheme, to provide a context for our analysis of section 37–92–305.

### A. Background

Colorado water law involving surface streams and tributary groundwater is governed by the doctrine of prior appropriation. *See* Colo. Const. art. XVI, § 6; *Coffin v. Left Hand Ditch Co.*, 6 Colo. 443, 447 (1882). Generally, the first appropriator of water for a beneficial use has a prior right to the water to the extent of such appropriation. *Coffin*, 6 Colo. at 447.

A priority in a water right is property in itself. *Nichols v. McIntosh*, 19 Colo. 22, 26–27, 34 P. 278, 280 (1893). In fact, much of the value of a water right lies in its priority: "It often happens that the chief value of an appropriation consists in its priority over other appropriations from the same natural stream." *Id.* The value of adjudicating this property right "is that it allows a priority to the use of a certain amount of water at a place somewhere in the hierarchy of users who also have rights to water from a common source such as a lake or river." *Navajo Dev. Co., Inc. v. Sanderson*, 655 P.2d 1374, 1377 (Colo.1982) (citing *Nichols*, 19 Colo. 22, 34 P. 278 (1893)). "Hence, to deprive a person of his priority is to deprive him of a most valuable property right." *Nichols*, 19 Colo. at 27, 34 P. at 280.

Thus, adjudication is essential to protecting a water right; adjudicating a water right realizes the value and expectations that enforcement through administration of that right's priority secures. In this regard, a junior appropriator is entitled to the maintenance of stream conditions existing at the time of its respective appropriation:

This court has often said, in substance, that a junior appropriator of water to a beneficial use has a vested right, as against his senior, in a continuation of the conditions on the stream as they existed at the time he made his appropriation. *If this means anything, it is that when the junior appropriator makes his appropriation he*

*acquires a vested right in the conditions then prevailing upon the stream, and surrounding the general method of use of water therefrom. He has a right to assume that these are fixed conditions and will so remain,* at least without substantial change, unless it appears that a proposed change will not work harm to his vested rights . . . .

*Vogel v. Minn. Canal & Res. Co.,* 47 Colo. 534, 541–42, 107 P. 1108, 1111 (1910) (emphasis added); *see also City of Thornton v. Bijou Irrigation Co.,* 926 P.2d 1, 80 (Colo. 1996); *Farmers Highline Canal & Reservoir Co. v. City of Golden,* 129 Colo. 575, 579, 272 P.2d 629, 631–32 (1954) (holding junior appropriators have vested rights in the continuation of stream conditions as they existed at the time of their respective appropriations); *Faden v. Hubbell,* 93 Colo. 358, 369, 28 P.2d 247, 251 (1933) ("A junior appropriator of water to a beneficial use has a vested right, as against his senior, in a continuation of the conditions on the stream as they existed at the time he made his appropriation.").

Another value of an adjudicated water right is the right to adapt an existing water right to a new use. *See* § 37–92–302, C.R.S. (2005). Such adaptations are, as here, accomplished primarily through changes of water rights and plans for augmentation.

The Water Right Determination and Administration Act (the "Act") sets forth the procedures and standards for adapting existing water rights to new uses through changes of water rights, plans for augmentation, and exchanges. The Act defines "change of water right" as a change in the type, place, or time of use. § 37–92–103(5), C.R.S. (2005). It also includes a change in the point of diversion, means of diversion, place of storage or virtually any other alteration involving a water right.[3] *Id.* After the change, the water right can still be exercised

under its original priority and adjudication date, provided other water rights are not injured. *Id.* § 37–92–305(3).

 A plan for augmentation is a "detailed program to increase the supply of water available for beneficial use". *Id.* § 37–92–103(9). This may be accomplished

by the development of new or alternate means or points of diversion, by a pooling of water resources, by *water exchange projects,* by providing substitute supplies of water, by the development of new sources of water, or by other appropriate means.

*Id.* (emphasis added). Although the statute emphasizes increasing the supply of water, "[n]ew water need not be injected to give life and validity to a plan for augmentation." *Kelly Ranch v. Se. Colo. Water Conservancy Dist.,* 191 Colo. 65, 74, 550 P.2d 297, 303 (1976). Rather, plans for augmentation are meant to increase the usable supply of water, not necessarily the physical supply. *See id.; City of Florence v. Bd. of Waterworks,* 793 P.2d 148, 152 (Colo.1990). A plan for augmentation operates outside the priority system and therefore operates out of priority. *See Empire Lodge Homeowners' Ass'n v. Moyer,* 39 P.3d 1139, 1154 (Colo.2002).

The definitions of change of water right and plan for augmentation include water right exchanges. § 37–92–103(9); *see also id.* § 37–92–305(3). A water right exchange is a trade of water between structures or users administered by the state engineer. *Id.* §§ 37–83–104, 37–80–120(2)—(4). It involves four critical elements:

(1) the source of substitute supply must be above the calling water right; (2) the substitute supply must be equivalent in amount and of suitable quality to the downstream senior appropriator; (3) there must be available natural flow at the point of upstream diversion; and (4) the rights

---

**3.** A "change of water right" is:

a change in the type, place, or time of use, a change in the point of diversion, a change from a fixed point of diversion, a change from a fixed point of diversion to alternate or supplemental points of diversion, a change from alternate or supplemental points of diversion to a fixed point of diversion, a change in the means of diversion, a change in the place of

storage, a change from direct application to storage and subsequent application, a change from storage and subsequent application to direct application, a change from a fixed place of storage to alternate places of storage, a change from alternate places of storage to a fixed place of storage, or any combination of such changes.

§ 37–92–103(5).

of others cannot be injured when implementing the exchange.

*Empire Lodge,* 39 P.3d at 1155. Because the diversion is upstream, and the substitute supply provided downstream, exchanges reduce the amount of water within the specific stream reach lying between the upstream diversion and the downstream introduction of substitute supply. *See City of Florence,* 793 P.2d at 149. They do not, however, increase or decrease the overall supply of water in the system because the substitute supply is equal to that which is diverted upstream. *See Empire Lodge,* 39 P.3d at 1155.

Substitutions and exchanges do not require prior approval of a water court decree. *See* § 37–80–120(1), C.R.S. (2005). However, a practice of substitution or exchange may constitute an appropriative water right and may be adjudicated as any other water right. *Id.* § 37–80–120(4); *see also id.* § 37–92–305(10). Thus, an exchange user can obtain the security of a decreed priority so that developments on the stream system after creation of the exchange do not negatively impact the exchange opportunity. Trout, Witwer & Freeman, P.C., *Acquiring, Using, and Protecting Water in Colorado* 137 (2004); *cf. Nichols,* 19 Colo. at 26–27, 34 P. at 280. Specifically, a decreed exchange makes the water between the two points of diversion unavailable to junior appropriators if such diversions would have the effect of stopping the exchange. *Trout, supra* at 137. If an exchange is adjudicated, the original priority date of the exchange is recognized and preserved. § 37–92–305(10).

As a practical matter, "virtually all transfers and exchanges involve changes of water rights and plans for augmentation." Glenn E. Porzak, "Innovative Transfer and Exchange Plans," *in Tradition, Innovation and Conflict: Perspectives on Colorado Water Law* 186 (Lawrence J. MacDonnell ed., 1986). An exchange may nevertheless be distinct from an augmentation plan. *City of Florence,* 793 P.2d at 151–52.

This court has previously described procedural distinctions between plans for augmentation and exchanges. An exchange program may be adjudicated or unadjudicated; a plan for augmentation must be adjudicated. *Em-*

*pire Lodge,* 39 P.3d at 1156 (quoting *City of Florence,* 793 P.2d at 156). An adjudicated exchange is given a priority date and is operated within the prior appropriation system; a plan for augmentation receives no priority and therefore operates outside of the prior appropriation system. *Id.*

In addition, we have here observed that an exchange reduces the amount of water for beneficial use within the affected stream reach, but neither increases nor decreases the physical supply of water. *See Empire Lodge,* 39 P.3d at 1155. A plan for augmentation is a "detailed program" that increases the supply of water available for beneficial use. *See Kelly Ranch,* 191 Colo. at 74, 550 P.2d at 303.

With this background in mind, we turn to the injury standard contained in section 37–92–305.

### B. The Injury Statute

Section 37–92–305 provides the standards for judicial approval of a change of water right or plan for augmentation, including exchange. Key to adapting an existing water right to a new use is the question of injury. Section 37–92–305 contains a number of subsections addressing the injury standard for both changes of a water right and plans for augmentation, including an exchange. Subsection 37–92–305(3) requires approval of a plan for augmentation, including exchange, if vested rights are not injured. Subsection (4) lists factors considered in making this injury determination. These two subsections target vested water rights and indicate a concern with historic use:

(3) A change of water right or *plan for augmentation, including water exchange project,* shall be approved if such change or plan will not injuriously affect the owner of or persons entitled to use water under a *vested water right* or a decreed conditional water right....

(4) Terms and conditions to prevent injury as specified in subsection (3) of this section may include:

(a) A limitation on the use of the water which is subject to the change, taking into consideration the *historic use* and the flex-

ibility required by annual climatic differences;

(b) The relinquishment of part of the decree for which the change is sought or the relinquishment of other decrees for which the change is sought or the relinquishment of other decrees owned by the applicant which are used by the applicant in conjunction with the decree for which the change has been requested, if necessary *to prevent an enlargement upon the historic use* or diminution of return flow to the detriment of other appropriators;

(c) A time limitation on the diversion of water for which the change is sought in terms of months per year;

(d) Such other conditions as may be necessary to protect the *vested rights* of others.

*Id.* § 37–92–305(3), (4) (emphasis added).

Subsection (5) addresses "plans for augmentation including exchange." It contains injury language addressing the rights of others, generally, and senior appropriators, specifically:

In the case of *plans for augmentation including exchange,* the supplier may take an equivalent amount of water at his point of diversion or storage if such water is available without impairing the *rights of others.* Any substituted water shall be of a quality and quantity so as to meet the requirements for which the water of the *senior appropriator* has normally been used, and such substituted water shall be accepted by the senior appropriator in substitution for water derived by the exercise of his decreed rights.

*Id.* § 37–92–305(5) (emphasis added).

Subsection (8) provides additional factors to be considered in making an injury determination for plans for augmentation. This subsection requires a judge to consider injury to "any owner of . . . a vested water right" and the state engineer to curtail out-of-priority diversions that deplete streamflow and are not replaced to prevent injury to vested rights. *Id.* § 37–92–305(8). It also indicates that an augmentation plan "shall be sufficient" if it meets the lawful requirements of a senior diverter:

In reviewing a proposed plan for augmentation and in considering terms and conditions that may be necessary to avoid injury, the referee or the water judge shall consider the depletions from an applicant's use or proposed use of water, in quantity and in time, the amount and timing of augmentation water that would be provided by the applicant, and the existence, if any, of injury to *any owner* of or persons entitled to use water under a *vested water right* or a decreed conditional water right. A plan for augmentation shall be sufficient to permit the continuation of diversions when curtailment would otherwise be required to meet a valid senior call for water, to the extent that the applicant shall provide replacement water necessary to meet the lawful requirements of a *senior diverter* at the time and location and to the extent the senior would be deprived of his or her lawful entitlement by the applicant's diversion. . . . Decrees approving plans for augmentation shall require that the state engineer curtail all out-of-priority diversions, the depletions from which are not so replaced as to prevent injury to vested water rights.

*Id.* § 37–92–305(8) (emphasis added).

In sum, the injury language in section 37–92–305 regarding augmentation plans addresses both vested rights and senior rights. The nature of Colorado's instream flow rights, however, informs the plain meaning of the statute: to approve an augmentation plan affecting a vested instream flow right, the applicant must include terms and conditions protecting the instream flow from injury.

An instream flow right is an in-place right to the use of water. A typical instream flow designates a specified level of flow over a stream segment stretching up to several miles. An amount of water to preserve the natural environment to a reasonable degree may also be obtained for a lake or other body of standing water. The quantity of water needed to maintain a particular lake level or other condition is typically expressed in acre feet; an instream flow is expressed in cubic feet per second.

As discussed in fuller detail below, instream flow or lake level rights are no differ-

ent in concept from other appropriative rights. They must be decreed to be administered; are given a fixed priority date, a specified flow rate or volumetric quantity, time and place of use; and are administered like any other water right, but no means of diversion is required.

Colorado's instream flow program traces to the 1950s Fryingpan–Arkansas Project, which threatened to dry up numerous western slope headwater streams. Steven J. Shupe, *The Legal Evolution of Colorado's Instream Flow Program*, 17 Colo. Law. 861, 861 (1988). To preserve the aquatic habitat, specified levels of flow were permitted to bypass diversion points to maintain natural streams. *Id.* These bypass flows were approved by the State, the United States Congress and the local water districts. *Id.* However, nothing prevented other appropriators from taking the releases once they moved through the project's diversion points. *Id.* Thus, a mechanism was sought to maintain free-flowing waters within the prior appropriation system.

Structural obstacles complicated the establishment of a legal mechanism to protect free-flowing streams and rivers. *Id.* Historically, to appropriate water, a user had to (1) "divert" water ("take water from a stream and transport it to another location for use") and (2) place it to a beneficial use. *Colo. River Water Conservation Dist. v. Colo. Water Conservation Bd.*, 197 Colo. 469, 473, 594 P.2d 570, 573 (1979). Implementing instream flows, which do not involve diverting water, thus required modifying the concept of "appropriation" in the existing statutory scheme.

In 1973, the Colorado General Assembly amended the Act with Senate Bill 97 to recognize an instream flow program. Act of April 23, 1973, ch. 442, 1973 Colo. Sess. Laws 79. To do so, it eliminated the need to divert water to appropriate and obtain a priority. It also broadly defined "beneficial use" to include the preservation of the natural environment:

> For the benefit and enjoyment of present and future generations, "beneficial use" shall also include the appropriation by the state of Colorado in the manner prescribed by law of such minimum flows between specific points or levels for and on natural streams and lakes as are required *to preserve the natural environment to a reasonable degree.*

1973 Colo. Sess. Laws 1521, § 1 (codified at § 37–92–103(3)) (emphasis added). Accordingly, the General Assembly identified instream flow legislation as a mechanism to protect the environment. *Bd. of County Comm'rs v. United States*, 891 P.2d 952, 971 (Colo.1995).

To this end, the General Assembly recognized as a basic tenet of Colorado water law the "need to correlate the activities of mankind with some reasonable preservation of the natural environment." § 37–92–102(3), C.R.S. (2005). The General Assembly vested the power to preserve the natural environment by appropriating levels of minimum stream flow with the Board:

> The Colorado water conservation board is hereby vested with the exclusive authority, on behalf of the people of the State of Colorado, to appropriate in a manner consistent with sections 5 and 6 of article XVI of the state constitution, such waters of natural streams and lakes as the board determines may be required for *minimum stream flows* or for natural surface water levels or volumes for natural lakes *to preserve the natural environment to a reasonable degree.*

*Id.* § 37–92–102(3) (emphasis added); *see also Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd.*, 901 P.2d 1251, 1256 (Colo.1995).

Significantly, instream flow and minimum lake level appropriations by the Board obtain a priority date and are subject to the priority system:

> Any such appropriation shall be subject to the present uses or exchanges of water being made by other water users pursuant to appropriation or practices in existence on the date of such appropriation, whether or not previously confirmed by court order or decree.

§ 37–92–102(3)(b), C.R.S. (2005). As indicated above, a validly adjudicated instream flow or lake level right recognizes a property

right vested in the Board on behalf of the people of Colorado. *See Nichols,* 19 Colo. at 26, 34 P. at 280; *Aspen Wilderness Workshop, Inc.,* 901 P.2d at 1256. As with all water rights, the value of this property is its priority. *See id.*

The value of an instream flow's priority does not, however, derive primarily from its place in the hierarchy of users who have rights to water from the same sources. Because it is a post–1973 appropriation, the Board's instream flow rights are usually relatively junior in the hierarchy of users. Because instream flows are administered within the priority system, the instream flow cannot take water away from existing uses and the senior will always be able to make its diversion for its decreed beneficial uses. Since the prior appropriation system thus guarantees that pre-existing uses are unaffected by junior instream flow rights, the date of its priority may be of little value in protecting instream resources.

 The legislature nonetheless clearly envisioned that the instream flow program would obtain, in reasonable measure, its goal of preserving the environment by ensuring that certain stream reaches would not be further depleted without conditions to protect against injury. *See* § 37–92–102(3), C.R.S. (2005). We conclude the legislature instead envisioned the primary value of an instream flow right to derive from a basic tenet of water law: its ability to preserve the stream conditions existing at the time of its appropriation. To effectuate this goal, this court has rejected the argument that subsequent junior appropriators may adjudicate rights superior to those instream flow water rights decreed to the Board. *Colo. River Water Conservation Dist.,* 197 Colo. at 477, 594 P.2d at 575. In rejecting this contention, we emphasized that the purpose of the legislation was to ensure that streams could not be dried up by subsequent upstream appropriators:

> The legislative intent is quite clear that these appropriations are to protect and preserve the natural habitat and the decrees confirming them award priorities [that] are superior to the rights of those who may later appropriate. *Otherwise,*

> *upstream appropriations could later be made, the streams dried up, and the whole purpose of the legislation destroyed.*

*Id.* (emphasis added). In short, although a junior instream flow cannot preserve minimum streamflows by taking water from existing uses, it can protect flow from subsequent appropriators: an instream flow may protect flow remaining in the stream after decreed senior rights are satisfied.

We now further conclude that, to effectuate the General Assembly's purpose of preserving the environment through minimum streamflows, the Board is entitled to necessary protective terms and conditions in a decree approving an augmentation plan. Water right proceedings are typically concerned with either appropriating a new water right or adapting an existing water right to a new use. Yet many Colorado basins are fully appropriated or overappropriated and it is infeasible to obtain a reliable supply of water based on new appropriations. *See* Leonard Rice & Michael D. White, *Engineering Aspects of Water Law* 77 (1987). As a result, the majority of water right adjudications—and, therefore, the biggest threat to maintaining minimum flows—involve adapting old water rights to new water requirements through changes and plans for augmentation, including exchanges. *See id.* at 77–78. Absent an ability to assert injury against a senior water right adapting to a new or enlarged use, instream flows could be eliminated by a change of water right or plan for augmentation.

It has long been the rule that a senior water right adapting to a new or enlarged use through a change of water right proceeding may do so only if it does not injure senior or junior users. *See Farmers Highline Canal & Reservoir, Co.,* 129 Colo. at 579, 272 P.2d at 631–32; § 37–92–305(3), (4), C.R.S. (2005). This noninjury requirement derives from the longstanding tenet of water law that a junior appropriator is entitled to expect that stream conditions existing at the time of appropriation will be maintained. *See Vogel,* 47 Colo. at 541–42, 107 P. at 1111. Under the noninjury rule, an application for a change of water right is always subject to the limitation that such change not injure the

rights of junior appropriators: "a junior appropriator may successfully resist all proposed changes in points of diversion and use of water from that source which in any way materially injures or adversely affects their rights." *Farmers Highline Canal & Reservoir, Co.*, 129 Colo. at 579, 272 P.2d at 631–32. As a result, the right to change a water right is limited in quantity by historical use at the original decreed point of diversion. *Weibert v. Rothe Bros., Inc.*, 200 Colo. 310, 318–19, 618 P.2d 1367, 1373 (1980). " 'Historical use' as a limitation on the right to change a water right applies the principle that junior appropriators have vested rights in the continuation of stream conditions as they existed at the time of their respective appropriations." *Id.* at 317, 618 P.2d at 1372. Subsections 37–92–305(3) and (4) codify this noninjury standard for a change of water right: "[b]efore the water court may grant an application for a change of water rights, the applicant must demonstrate that the proposed change will not injuriously affect the vested rights of other water users." *Orr v. Arapahoe Water & Sanitation Dist.*, 753 P.2d 1217, 1222–23 (Colo.1988).

■ Thus, a junior instream flow right may resist all proposed changes in time, place, or use of water from a source which in any way materially injures or adversely affects the decreed minimum flow in the absence of adequate protective conditions in the change of water right or augmentation decree. *See Weibert,* 200 Colo. at 317, 618 P.2d at 1372; Daniel S. Young, *Developing a Water Supply in Colorado: The Role of an Engineer,* 3 U. Denv. Water L.Rev. 373, 386 (2000).

We hold the noninjury requirement applicable to changes of water rights also applies to augmentation plans affecting instream flow rights. We likewise hold that an adjudicated instream flow right entitles its holder to maintain the stream conditions existing at the time of its appropriation and to resist proposed developments through changes of water rights or augmentation plans, regardless of the means, that in any way materially injure instream flow rights.

This rule best effectuates the clear legislative intent to protect and preserve the natural habitat through minimum streamflows. In the absence of this rule, senior diverters could simultaneously increase the supply of water yet divert around or from an existing instream flow right by a water project exchange or other means. Were this permitted, the prohibited result we noted in *Colorado River Water Conservation District* would occur: upstream adaptations could later be made, the streams dried up, and the whole purpose of the legislation destroyed. 197 Colo. at 477, 594 P.2d at 575. This, the legislature did not intend. *See id.* To the contrary, the General Assembly identified instream flows as the mechanism to effect a basic tenet of Colorado water law: "to correlate the activities of mankind with some reasonable preservation of the natural environment." § 37–92–102(3), C.R.S. (2005).

We note this holding is consistent with prior case law announcing that the injury standard is the same for a change of water rights and augmentation plans. Specifically, we have previously held that

a plan for augmentation is to be approved by the water judge based on the same criterion involved in evaluating an application for change of water right, i.e., approval is required "if such change or plan will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right."

*Weibert,* 200 Colo. at 318–19, 618 P.2d at 1373 (quoting § 37–92–305(3)); *see also Simpson v. Yale Inv. Inc.,* 886 P.2d 689, 696 (Colo.1994); *State Eng'r v. Castle Meadows,* 856 P.2d 496, 507 (Colo.1993).

We recognize that instream flows thus potentially complicate development in the form of changes, augmentation plans, and new appropriative rights by "tying up" a stream. Yet all water rights complicate the efforts of new or existing users to develop sources of supply. Christopher H. Meyer, "Instream Flows: Integrating New Uses and New Players Into the Prior Appropriation System," *in Instream Flow Protection in the West,* 2–13 (Lawrence J. MacDonnell & Teresa A. Rice eds., 1993). This result is endemic to the priority system and property rights generally. *See id.*

■ Thus, we hold section 37–92–305 plainly requires an augmentation plan affecting a vested instream flow to include in its decree terms and conditions protecting said instream flow from injury. Accordingly, we reverse the water court's determination of law that "Central City is not required to include terms and conditions in its proposed decree that would protect the Board's junior instream flow right from diminished flows resulting from Central City's operation of the plan for augmentation."

## C. Decree and Amended Order

We now turn to the water court's Decree and Amended Order. To address the terms and conditions of the Decree and Amended Order, we must first determine whether Central's plan for augmentation includes the exchange.

### 1.

Under Central's appropriative right of exchange, Central proposes to divert water at Miners Gulch, Pecks Gulch, Broomfield Gulch, Hole–in–the–Ground Reservoir, Chase Gulch Reservoir, North Clear Creek Pumping Pipeline, and the Fall River Pumping Pipeline. Central's proposed exchange uses three primary sources of water as substitute water: (1) Central's shares of the Farmers High Line Canal, (2) Central's Wannamaker Ditch water rights, and (3) reusable effluent from the Black Hawk–Central City Wastewater Treatment Plant. Thus, consistent with the definition of an exchange, its diversions are upstream, its substitute supply downstream, and the streamflow in the intervening stream reach reduced.

Central's augmentation plan involves two primary points for augmentation: Miners and Pecks Gulch and the Gilpin County Wells. Under the Miners and Pecks Gulch portion of its augmentation plan, Central proposes to divert, out of priority, at: Miners Gulch, Pecks Gulch, Broomfield Gulch, Hole-in–the–Ground Reservoir, Chase Gulch Reservoir, North Clear Creek Pumping Pipeline, and the Fall River Pumping Pipeline. Central's proposed plan for augmentation uses three primary sources of water to augment its out-of-priority diversions: (1) Central's shares of the Farmers High Line Canal, (2) Central's Wannamaker Ditch water rights, and (3) reusable effluent from the Black Hawk–Central City Wastewater Plant. Thus, this portion of its augmentation plan diverts water upstream, substitutes water downstream, and thus reduces the streamflow in the intervening stream reach.

In sum, both this portion of the augmentation plan and the exchange on North Clear Creek request to divert from Miners Gulch, Pecks Gulch, Broomfield Gulch, Hole–in–the–Ground Reservoir, Chase Gulch Reservoir, North Clear Creek Pumping Pipeline, and the Fall River Pumping Pipeline. And, both request to replace these diversions with its changed rights from Farmers High Line Canal and Wannamaker Ditch and with reusable effluent. Hence, the Miners and Pecks Gulch portion of Central's augmentation plan includes the exchange.

The second portion of Central's plan augments the Gilpin County Wells and water rights. Central did not include these wells in its request for an appropriative right of exchange. Central argues the five wells are located near ephemeral streams and live stream flows rarely exist. Central further asserts that most non-exempt tributary wells that are not located in close proximity to a live stream must be operated pursuant to a plan for augmentation because well pumping creates delayed depletions for days, months, or even years, which depletions at times will be out of priority. Central asserts the State Engineer neither allows exchanges to wells that are not located in close proximity to a stream, nor allows exchanges on a dry stream. Central thus maintains these structures cannot operate as upstream points of diversion in an exchange and were never claimed as part of Central's exchange. Hence, Central contends, the Gilpin County School wells are not "exchange to" points of diversion in Central's 1992 Exchange and the Decree hence requires a "live" stream for the operation of the 1992 Exchange.

Central does not provide authority for these assertions. Nor does Central direct us to particular facts regarding the wells at issue here. Namely, Central does not indicate whether the facts here would prohibit an

exchange from operating to the wells. Central does not specify whether these wells are located in close proximity to a stream or whether the stream is dry. We therefore express no opinion whether an exchange can operate to a well. Rather, we reiterate our holding here: whether or not this portion of Central's augmentation plan includes an exchange, the Board is entitled to adequate protective terms and conditions if Central's augmentation plan will injure the instream flow right.

We now turn to the Decree approved by the water court in Case No. 92CW168.

### 2.

The parties agree, and the Decree provides, that Central's appropriative right of exchange and substitution will be exercised within the priority system vis-à-vis the entire stream system. Central's rights of exchange and substitution are subject to the legitimate call of water rights senior to the priority of Central's rights of exchange and substitution, and are able to call out water rights junior to the priority of Central's rights of exchange and substitution. See *City of Florence*, 793 P.2d at 150 n. 4; *see also Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson*, 990 P.2d 46, 54 (Colo.1999) ("The purpose of adjudication is to fix the priority of a water right for its decreed uses so that it can be administered vis-à-vis all other decreed water rights.").[4]

Accordingly, the Decree subordinates Central's appropriative right of substitution and exchange to the Board's instream flow right. Specifically, the Decree provides that Central shall not divert under its junior rights—the appropriative right of substitution and exchange adjudicated in 92CW168 and the direct flow and storage water rights adjudicated in 91CW125—including such diversions by augmentation and exchange, unless 1.5 c.f.s. is available in North Clear Creek for the Board's instream flow water right.

This condition includes language limiting diversions by both augmentation and exchange from Miners and Pecks Gulches to protect the instream flow right. As a result, this condition would appear to adequately implement the no-injury rule announced here with regard to diversions at Miners and Pecks Gulches. To the extent the Decree fully protects the Board's instream flow right from injury under both Central's exchange *and* plan for augmentation, it is consistent with (1) our observation that the Miners and Pecks Gulch portion of the augmentation plan includes the appropriative right of exchange and must be subordinate to the instream flow right; and (2) our holding that the Board is entitled to impose terms and conditions protecting its instream flow right from injury under Central's plan for augmentation.

However, the Decree also explicitly excludes from its definition of "Junior Rights" Central's existing rights at Tascher Ranch Line, Toimby Ranch Feeder, Wilson Ranch Feeder Miners Gulch Ditch, Pecks Gulch,

4. Certain amici maintain that water exchanges obtain priority dates vis-à-vis only other exchanges, rather than vis-à-vis the stream system. The statutory language is to the contrary. Section 37–80–120(4) states that an exchange is to be treated like any other right of appropriation: "[a] practice of substitution and exchange pursuant to law may constitute an appropriative right and may be adjudicated or evidenced as any other right of appropriation." An adjudicated priority date obtains a priority date consistent with the date it began operating:

> If an application filed under section 37–92–302 for approval of an existing exchange of water is approved, the original priority date or priority dates of the exchange shall be recognized and preserved unless such recognition or preservation would be contrary to the manner in which such exchange has been administered.

§ 37–92–305(10).

This subsection contains no language qualifying the operation of the priority date, such as "an exchange of water obtains a priority date that operates vis-à-vis only other exchanges." Had the legislature intended to create an exception for an appropriative right of exchange, it could have so stated. *People in re J.R.T.*, 55 P.3d 217 (Colo.App.2002), *aff'd* 70 P.3d 474 (Colo.2003). Accordingly, by its plain language, subsection 305(10) assigns exchanges a priority date vis-à-vis the stream system, like any other right of appropriation. *See City of Florence*, 793 P.2d at 150 n. 4 (affirming decree finding that Pueblo's rights of exchange subject to legitimate call of water rights senior to the priority of Pueblo's rights of exchange and substitution); *Santa Fe Trail Ranches*, 990 P.2d at 54 (adjudication fixes priority date vis-à-vis all other decreed water rights).

Central City Water Reservoir, and Hole–in–the–Ground Reservoir. To the extent this provision permits Central to divert out of priority under its augmentation plan, even if so doing would injure the Board's instream flow right, it conflicts with our holding here that Central's augmentation plan shall not be approved if it will injure the Board's right. Finally, we note that the Decree does not include terms and conditions protecting the instream flow from out-of-priority diversions made from the Gilpin County Wells.

### D. Conclusion

Based on its finding that the Board was not entitled to protective terms and conditions in Central's plan for augmentation decree, the water court made no findings as to whether the instream flow could be injured in fact by Central's augmentation plan. We reverse the water court's determination of law that an applicant for an augmentation plan is not obligated to protect the decreed instream flow appropriations from injury. We remand with instructions to the water court to revise the Decree consistent with this opinion. Specifically, the Decree should fully protect the Board's instream flow right from injury under both Central's appropriative right of exchange and the plan for augmentation.

### III. Cross–Appeal

On cross-appeal, Central contends the water court erred by not allowing Central to relate back the priority date of its exchange to the date on which the exchange was first operated under section 37–92–305(10). The priority date of an appropriation relates back to the date on which an appropriator takes the "first step" to secure a water right as long as the application of water to beneficial use is completed with reasonable diligence. *See City of Denver v. Colo. River Water Conservation Dist.*, 696 P.2d 730, 745 (Colo.1985); *see also* § 37–92–305(10), C.R.S. (2005). The applicant bears the burden of proving that the first step has been completed on a particulate date. *See City of Aspen v. Colo. River Water Conservation Dist.*, 696 P.2d 758, 761 (Colo.1985). "[W]hether the requisite first step has been

taken must be made on an ad hoc basis, taking into account the particular facts in each case." *Id.* (citing *Lionelle v. Se. Colo. Water Conservation Dist.*, 676 P.2d 1162, 1168 (Colo.1984)).

In *City of Aspen,* we emphasized that the "first step" to initiate an appropriation and to relate back a priority date consists "of the concurrence of the intent to appropriate water for application to beneficial use with an overt manifestation of that intent through physical acts sufficient to constitute notice" to interested parties. 696 P.2d at 761. The overt act or acts must be "of such character as to manifest the necessary intent and ... most importantly, to constitute notice to interested persons of the nature and extent of the proposed demand upon the water supply." *Id.* at 762–63. "The matter does not rest upon the intent of the claimant, but rather upon such outward, physical acts and manifestations in pursuance of such intent as may be deemed sufficient notice to all who may come." *Id.* (quoting *Fruitland Irrigation Co. v. Kruemling,* 62 Colo. 160, 165–66, 162 P. 161, 163 (1963)).

Central requested an appropriative right of exchange in an amount of 4.1 c.f.s. It presented testimony that, based on an August 1992 accounting record, the exchange was operated at a rate of 0.24 c.f.s as of August 1, 1992. Central argues that it is entitled to relate back the priority date for its appropriative right of exchange to the date on which the exchange became an "existing exchange." In this regard, Central contends the water court erred by not finding that the priority date for the exchange was August 1, 1992, the date on which the exchange first operated and became an "existing exchange."

The water court ruled that Central's asserted exchange of 0.24 c.f.s. provided insufficient notice to third parties regarding the extent of Central's intended appropriation:

This court interprets § 37–92–305(10) as authorizing an appropriator who has satisfied the elements of first step (i.e., established an intent to appropriate and completed an overt act in furtherance of that intent that sufficiently notified third parties of the intent to appropriate) with re-

gard to an exchange to obtain an appropriation date that reflects the date of their first step. Central's *asserted exchange on August 1, 1992 of 0.24 c.f.s did not adequately notice third parties of the extent of Central's intended appropriation. Thus, this court finds that because Central City did not satisfy the elements of first-step with regard to its 4.1 c.f.s. exchange prior to filing its application, the date of filing the application is the correct appropriation date.*

(Emphasis added.)

Section 37–92–305(10) provides:

If an application filed under section 37–92–302 for approval of an *existing exchange* of water is approved, the original priority date or priority dates of the exchange shall be recognized and preserved *unless such recognition or preservation would be contrary to the manner in which such exchange has been administered.*

(Emphasis added.) Ordinarily, "an existing exchange of water" may be an overt manifestation of intent sufficient to presume adequate notice. *See id.* The statute, however, does not afford this presumption of notice when recognition or preservation of the original priority date "would be contrary to the manner in which such exchange has been administered." *See id.* Thus, the statute is consistent with the requirement that there must be an overt act of operation sufficient to give notice to third parties of the nature and extent of the proposed demand.

Regarding the sufficiency of the existing exchange for adequate notice, the water court's order indicates that recognizing an August 1, 1992 priority date would be contrary to the manner in which such an exchange has been administered because of the discrepancy between 0.24 c.f.s and 4.1 c.f.s. Hence, the water court acted within its discretion by focusing on the extent of the appropriation as evidenced on August 1, 1992, and by concluding that operation of the exchange to the extent of only 0.24 c.f.s did not create the requisite presumption of notice. Thus, it was within the water court's discretion to conclude that Central did not satisfy the first-step element and, therefore, the water court did not err by denying rela-

tion back under the exception contained in section 37–92–305(10).

Accordingly, we affirm the water court's award of a December 31, 1992 priority date to Central's North Clear Creek exchange.