Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
July 1, 2019

**2019 CO 68**

**No. 16SA291,** *City & Cty. of Denver v. Consol. Ditches of Water Dist. No. 2* — Water Law — Priorities — Exchange and Substitution Operations.

Under a 1940 water use agreement, Denver agreed, in lieu of making releases from certain streambed reservoirs to replace seepage and evaporation losses, not to reuse or successively use return flows from water imported from the western slope.  Earlier litigation established that this reuse prohibition in the 1940 agreement applies only to return flows derived from decreed water rights from Colorado River sources with appropriation dates before May 1, 1940; Denver may therefore use return flows derived from sources that were appropriated or acquired after that date.  The question in this appeal is whether the 1940 agreement prohibits Denver from using return flows from water imported from the Blue River system under exchange and substitution operations decreed in 1955 and administered under a 1946 priority date using water stored in the Williams Fork Reservoir under a 1935 priority as a substitute supply.

Because the water imported through the Roberts Tunnel under Blue River exchange and substitution operations is a source acquired by Denver after May 1, 1940,

the supreme court concludes that the resulting return flows are not subject to the 1940 Agreement and Denver may reuse and successively use them. Accordingly, the supreme court affirms the judgment and decree of the water court.

## The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

___

## 2019 CO 68

___

### Supreme Court Case No. 16SA291
*Appeal from the District Court*
Weld County District Court, Water Division 1, Case No. 12CW5
Honorable James F. Hartmann, Water Judge

___

Concerning the Application for Water Rights of the City and County of Denver, acting by and through its Board of Water Commissioners in Douglas, Jefferson, Arapahoe, Denver, Broomfield, Weld, Adams, and Park Counties.

### Applicant-Appellee:

The City and County of Denver, acting by and through its Board of Water Commissioners,

v.

### Opposers-Appellants:

Consolidated Ditches of Water District No. 2; Parker Water and Sanitation District; Central Colorado Water Conservancy District; City of Aurora; and Farmers Reservoir and Irrigation Company,

and

### Opposers-Appellees:

Bijou Irrigation Company and Bijou Irrigation Ditch, Centennial Water and Sanitation District, City and County of Broomfield, City of Brighton, City of Commerce City, City of Louisville, City of Thornton, City of Westminster, Coors Brewing Company, East Cherry Creek Valley Water and Sanitation District, Fairmount Cemetery Company, Farmers High Line Canal, Fulton Irrigation Ditch Company, Henrylyn Irrigation District, New Brantner Extension Ditch, Northern Colorado Water Conservancy District, Platte Valley Irrigation Company, Public Service Company of Colorado, South Adams County Water and Sanitation District, South Suburban Park and Recreation District, Denver County Club, Upper Cherry Creek Water Association, and United Water and Sanitation District,

and Concerning

**Appellees Pursuant to C.A.R. 1(e):**

Corey DeAngelis, Division Engineer, Water Division No. 1; and Kevin Rein, State Engineer.

---

**Judgment Affirmed**
*en banc*
July 1, 2019

---

**Attorneys for Applicant-Appellee City and County of Denver:**
Patricia L. Wells
Daniel J. Arnold
Casey S. Funk
    *Denver, Colorado*

**Attorneys for Opposer-Appellant Consolidated Ditches of Water District No. 2:**
Hoskin Farina & Kampf, P.C.
William A. Hillhouse II
Eliza F. Hillhouse
John P. Justus
    *Grand Junction, Colorado*

Law Office of Brice Steele, P.C.
Brice Steele
    *Brighton, Colorado*

**Attorneys for Opposer-Appellant Parker Water and Sanitation District:**
Krassa & Miller, LLC
Robert F. T. Krassa
    *Boulder, Colorado*

**Attorneys for Opposer-Appellant Central Colorado Water Conservancy District:**
Lawrence Jones Custer Grasmick, LLP
Kim R. Lawrence
David P. Jones
Wesley S. Knoll
    *Johnstown, Colorado*

**Attorneys for Opposer-Appellant City of Aurora:**
Hamre, Rodriguez, Ostrander & Dingess, P.C.
John M. Dingess
Peter C. Johnson
*Denver, Colorado*

**Attorneys for Opposer-Appellant Farmers Reservoir and Irrigation Company:**
Fairfield and Woods, P.C.
Joseph B. Dischinger
Beth Ann J. Parsons
Beth Van Vurst
Dean C. Hirt, III
*Denver, Colorado*

**Attorneys for Opposer-Appellee Northern Colorado Water Conservancy District:**
Trout Raley
Bennett W. Raley
Douglas M. Sinor
William Davis Wert
*Denver, Colorado*

**Attorneys for Appellees Pursuant to C.A.R. 1(e) Corey DeAngelis, Division Engineer, Water Division No. 1; and Kevin Rein, State Engineer**:
Philip J. Weiser, Attorney General
Paul L. Benington, First Assistant Attorney General
*Denver, Colorado*

**Attorneys for Amicus Curiae Board of County Commissioners of Summit County, Colorado:**
Petros & White, LLC
Charles B. White
David S. Hayes
*Denver, Colorado*

**Attorneys for Amicus Curiae The Colorado River Water Conservation District:**
Peter C. Fleming
Jason V. Turner
*Glenwood Springs, Colorado*

**Attorneys for Amicus Curiae City of Colorado Springs:**
City Attorney's Office
Michael Gustafson
*Colorado Springs, Colorado*

Hill & Robbins, P.C.
David W. Robbins
Matthew A. Montgomery
*Denver, Colorado*

**Attorneys for Amici Curiae Eagle River Water & Sanitation District and Upper Eagle Regional Water Authority:**
Porzak Browning & Bushong LLP
Glenn E. Porzak
*Boulder, Colorado*

**Attorneys for Amici Curiae Grand Valley Water Users Association, Orchard Mesa Irrigation District, and Ute Water Conservancy District:**
Williams Turner & Holmes, P.C.
Kirsten M. Kurath
*Grand Junction, Colorado*

**Attorneys for Amicus Curiae Middle Park Water Conservancy District:**
Cazier & McGowan
Stanley W. Cazier
*Granby, Colorado*

**Attorneys for Amicus Curiae Palisade Irrigation District:**
Dufford, Waldeck, Milburn & Krohn, LLP
Nathan A. Keever
*Grand Junction, Colorado*

No appearance on behalf of: Bijou Irrigation Company and Bijou Irrigation Ditch, Centennial Water and Sanitation District, City and County of Broomfield, City of Brighton, City of Commerce City, City of Louisville, City of Thornton, City of Westminster, Coors Brewing Company, East Cherry Creek Valley Water and Sanitation District, Fairmount Cemetery Company, Farmers High Line Canal, Fulton Irrigation Ditch Company, Henrylyn Irrigation District, New Brantner Extension Ditch, Platte Valley Irrigation Company, Public Service Company of Colorado, South Adams County Water and Sanitation District, South Suburban Park and Recreation District, Denver County Club, Upper Cherry Creek Water Association, and United Water and Sanitation District.

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.

4

¶1      This appeal from the water court in Water Division 1 represents the latest chapter in litigation over a 1940 water use agreement (1940 Agreement) between the City and County of Denver, acting by and through its Board of Water Commissioners (Denver) and the ditch company members of Consolidated Ditches of Water District No. 2 (Consolidated Ditches).[1]  The purpose of the 1940 Agreement was to resolve the parties' disputes regarding seepage and evaporation losses from three of Denver's streambed reservoirs located on the South Platte River.  Under the 1940 Agreement, in lieu of making releases from the streambed reservoirs to replace seepage and evaporation losses, Denver agreed not to reuse or successively use[2] return flows from water imported from the western slope and used in Denver's municipal water system.

¶2      Earlier litigation in Case No. 81CW405 established that this reuse prohibition in the 1940 Agreement applies only to return flows derived from decreed water rights from Colorado River sources with appropriation dates before May 1, 1940 (the date Denver entered into the agreement); Denver may therefore use return flows derived from sources

---

[1] Consolidated Ditches of Water District No. 2 presently consists of the following member ditch companies: New Brantner Extension Ditch Company, Brighton Ditch Company, Farmers Independent Ditch Company, Fulton Irrigation Ditch Company, Lupton Bottom and Lupton Meadows, Meadow Island No. 1, Meadow Island No. 2, Beeman Ditch & Milling Company, Platteville Irrigating & Milling Company, Platte Valley Irrigation Company, and Western Mutual Ditch Company.

[2] "'Reuse' means a subsequent use of imported water for the same purpose as the original use; 'successive use' means subsequent use of the water by the importer for a different purpose." *Grand Valley Water Users Ass'n v. Busk-Ivanhoe, Inc.*, 2016 CO 75, ¶ 48 n.7, 386 P.3d 452, 465 n.7.

5

that were appropriated or acquired after that date. *City & Cty. of Denver v. Consol. Ditches Co. of Dist. No. 2 (Consolidated Ditches)*, 807 P.2d 23, 38 (Colo. 1991). The question in this appeal is whether the 1940 Agreement prohibits Denver from using return flows from water imported from the Blue River system under exchange and substitution operations that use water stored in the Williams Fork Reservoir under a 1935 priority as a substitute supply.

¶3 This issue arose out of Denver's application in Case No. 04CW121 to adjudicate and quantify reusable lawn irrigation return flows (LIRFs) for use as a substitute supply in exchanges and augmentation plans. In its application, Denver sought confirmation that it could include among its sources of LIRFs the return flows from water imported through the Roberts Tunnel under Blue River exchange operations using the Williams Fork Reservoir as a substitute supply. Consolidated Ditches objected to Denver's inclusion of these return flows, arguing that their reuse is prohibited under the 1940 Agreement.

¶4 The water court bifurcated the issues involving the applicability of the 1940 Agreement into this separate case, No. 12CW05. Denver filed a C.R.C.P. 56(h) motion for determination of a question of law, and Consolidated Ditches filed a competing C.R.C.P. 56(c) motion for summary judgment, both raising essentially the same question: whether the 1940 Agreement prevents Denver from using return flows from water imported through the Roberts Tunnel under Blue River exchange and substitution operations using Williams Fork Reservoir water as a substitute supply.

¶5 In a written order, the water court resolved these competing motions in Denver's favor, ruling that Denver's Blue River system water, which was decreed in 1955 with an appropriation date of June 24, 1946, is a source of water that was not owned, appropriated, or acquired by Denver prior to May 1, 1940, and therefore is not subject to the 1940 Agreement. The court reasoned that Blue River system water is imported through the Roberts Tunnel under a 1946 priority date, whether it is imported after diversion in priority, or after out-of-priority diversions enabled by Denver's exchange operations using water released from Williams Fork Reservoir as a substitute supply. The water court thus held that Denver may reuse or successively use imported water attributed to the Blue River system. The water court later entered its findings of fact, conclusions of law, judgment, and decree, which incorporated its earlier order on the parties' competing C.R.C.P. 56 motions. Consolidated Ditches and other opposers appealed.

¶6 Consolidated Ditches contends that the 1940 Agreement applies to prevent Denver from reusing or successively using water imported through the Roberts Tunnel under Blue River exchange and substitution operations. It argues that under the so-called "character of exchange rule," the water diverted by exchange takes on the "character" of the substitute supply — here, the water stored in the Williams Fork Reservoir under a 1935 priority. Thus, it contends, the return flows from the water imported through the Roberts Tunnel are derived from a source with an appropriation date before May 1, 1940. Denver responds that the water court correctly concluded that the 1940 Agreement does not

7

apply to prohibit Denver from reusing or successively using water imported under the Blue River exchange operations because those operations were decreed in 1955 and are administered under a 1946 priority. In other words, the return flows are derived from a source that was acquired by Denver after May 1, 1940.

¶7 We agree with Denver. At the time it entered the 1940 Agreement, Denver could not import water through the Roberts Tunnel by exchange (or otherwise). Denver's ability to divert water from the Blue River system by exchange or substitution using Williams Fork Reservoir water as a source of substitute supply was adjudicated in 1955, and the exchange is administered under a June 24, 1946 priority, consistent with the appropriation date of Denver's rights in the Blue River system. Thus, for purposes of the 1940 Agreement, we hold that the water imported through the Roberts Tunnel under Blue River exchange and substitution operations is a source acquired by Denver after May 1, 1940. Accordingly, the return flows from those operations are not subject to the 1940 Agreement and Denver may reuse or successively use those return flows.

¶8 We disagree with Consolidated Ditches that the so-called "character of exchange rule" requires a different result here. The character of exchange concept has emerged as an unofficial, permissive practice recognized by the State Engineer, but it does not appear in statute, nor have we expressly applied it in case law or defined its scope. We therefore decline to adopt a mandatory character of exchange "rule" that applies rigidly to all exchange operations. Whatever its scope or applicability in other circumstances, the character of exchange principle is unnecessary here to ensure that the purpose of the 1940

8

Agreement is fulfilled or to avoid injury to Consolidated Ditches. It is undisputed that current importations of water through the Moffat Tunnel under pre-1940 priorities more than fully offset the streambed reservoir seepage and evaporation losses that prompted the 1940 Agreement. If anything, application of the character of exchange principle to bar Denver's reuse of water imported through the Roberts Tunnel by exchange or substitution would only enlarge the existing windfall in Consolidated Ditches' favor.

¶9 Accordingly, we affirm the judgment and decree of the water court.

## I. Background

¶10 Given the complexity of the factual and legal background in this case, it is necessary to set both out in detail to understand the issues before us. First, we describe the relevant aspects of Denver's transmountain water systems at issue. We then discuss the background and content of the 1940 Agreement. Finally, we review our two prior decisions interpreting the agreement, *City & County of Denver v. Fulton Irrigating Ditch Co.*, 506 P.2d 144 (Colo. 1972), and *Consolidated Ditches*, 807 P.2d 23.

## A. Denver's Transmountain Water Systems

¶11 Denver's extensive and complex water supply system includes rights to several sources of water tributary to the Colorado River originating on the western slope of the Continental Divide. Denver also owns and operates collection systems, reservoirs, and tunnels to import water from these Colorado River basin sources for use on the eastern slope. The transmountain system components relevant to this dispute are the Fraser and

9

Williams Fork systems, the Williams Fork Reservoir, and the Blue River system. The following map (Water Collection System Map) provides an overview of these systems.

# City and County of Denver
## Board of Water Commissioners
# Water Collection System



## LEGEND

| | | | |
|---|---|---|---|
| ▢ | South Platte Collection System | ◆ | Denver Water Treatment Plant |
| ▢ | Roberts Tunnel Collection System | ⊙ | Town |
| ▢ | Moffat Collection System | ▪▪▪ | Continental Divide |
| — | Williams Fork Reservoir Watershed | — | Major Stream or River |
| ▰ | Major Lake or Reservoir | — | Major Canal or Tunnel |

N

1:1,000,000

0 10 20 40
Miles
Scale number is accurate when printed at 8.5 x 11 inches in size.

October 2012
\wrgis\projects\dws\maps\system-plot-8x11.mxd

This Geographic Information Systems (GIS) map is provided 'as is' with no claim
by the Denver Water Board as to the completeness, usefulness or accuracy of its content.
© 2012 Denver Water

DENVER WATER

### 1. Fraser and Williams Fork Systems (Moffat Tunnel Collection System) and the Williams Fork Reservoir

¶12     The Fraser River and the Williams Fork River are tributaries of the Colorado River on the western slope of the Continental Divide. Denver has rights to divert water from these rivers through the Fraser River and Williams Fork Diversion Projects, which were decreed in 1937 by the Grand County District Court in Civil Action No. 657 with an appropriation date of July 4, 1921.

¶13     Water diverted from both the Fraser and Williams Fork River collection systems is imported through the Moffat Tunnel. The Fraser River Diversion Project diverts water from the Fraser River and its tributaries and since 1936, has delivered that water through the Moffat Tunnel to the eastern slope for storage and use.[3] The Williams Fork River Diversion Project includes the Gumlick Tunnel and the Vasquez Tunnel. The Gumlick Tunnel is used to import water diverted from the headwaters of the Williams Fork River and its tributaries. Starting in 1940, and before the completion of the Vasquez Tunnel in approximately 1958, the Gumlick Tunnel water was delivered to Clear Creek (a tributary of the South Platte River) for subsequent exchange. Since approximately 1958, the water imported through the Gumlick Tunnel has been conveyed through the Vasquez Tunnel to the Fraser River Diversion Project, where it is subsequently conveyed through the Moffat Tunnel to the eastern slope.

---

[3] See the Moffat Tunnel Collection System Map, *infra*, for an illustration of the location of the Fraser River, Williams Fork River, and the Moffat Tunnel.

¶14     Additionally, Denver stores water in the Williams Fork Reservoir, an on-channel reservoir that impounds water on the Williams Fork River above its confluence with the Colorado River.  The Williams Fork Reservoir was also decreed in 1937 in Civil Action No. 657, but with an appropriation date of November 10, 1935.  The Williams Fork Reservoir lies downstream from the Williams Fork River collection system; Denver therefore cannot physically deliver water from that reservoir directly to the eastern slope.[4]  Instead, when a senior call is in effect, Denver releases the water stored in the Williams Fork Reservoir as replacement water in exchange and substitution operations to allow Denver to continue to divert and store water out of priority at its Fraser River and Williams Fork River collection systems, or, as relevant here, at its Blue River collection system.  Per the 1940 Agreement and the Amended Ruling and Order in Case No. 81CW405 following this court's decision in *Consolidated Ditches*, Denver does not reuse return flows from water imported through the Moffat Tunnel under its 1921 Fraser River and Williams Fork River Diversion Projects, including water diverted from these two projects using Williams Fork Reservoir water as a replacement source.

---

[4] *See* Moffat Tunnel Collection System Map, *infra*.

13

# City and County of Denver
## Board of Water Commissioners
# Moffat Tunnel Collection System



### Legend

| | | | |
|---|---|---|---|
| • (green) | Carr No. 2 (C.A. No. 657) | — (orange) | Moffat Tunnel Collection System (C.A. No. 1430) |
| • (red) | Williams Fork Power Conduit (C.A. No. 1430) | — (green) | Darling Ck.Ext. of the Williams Fork Div. Proj., Proposed (C.A. No. 1430 |
| — (yellow) | Conveyance Tunnels | ▪▪▪ | Continental Divide |
| — (purple) | Williams Fork Diversion Project(C.A. No. 657) | (purple fill) | Williams Fork |
| — (blue) | Williams Fork Extension to South Fk., Proposed (C.A. No. 657) | (green fill) | Existing Moffat Collection System Drainage Area |
| — (magenta) | Fraser River Diversion Project(C.A. 657) | | |



DENVER WATER



March 1, 2016

## 2. Blue River System (Roberts Tunnel Collection System)

¶15    Water rights in the Blue River have been the subject of substantial litigation in both state and federal court, resulting in a 1955 federal decree, followed by a suite of supplementary and amendatory orders, judgments, and decrees. Because Blue River exchange and substitution operations are part of this complex history, we both describe the Blue River system and briefly review the relevant decrees establishing the June 24, 1946 priority date for administration of these operations.

### a. Blue River Diversion Project

¶16    Like the Williams Fork and Fraser Rivers, the Blue River is also a tributary of the Colorado River on the western slope. The Blue River Diversion Project consists of Dillon Reservoir and the Roberts Tunnel. Dillon Reservoir is an on-channel reservoir that impounds water on the Blue River and several tributaries above the Blue River's confluence with the Colorado River. The Blue River Diversion Project collects water at the confluence of the Snake River, Blue River, and Ten Mile Creek. This water can be stored in Dillon Reservoir for later transport through the Roberts Tunnel, or it can be placed directly in the Roberts Tunnel and conveyed to the North Fork of the South Platte River on the eastern slope. Denver began importing water through the Roberts Tunnel in 1964.

¶17    Denver also releases water stored in the Williams Fork Reservoir to make replacements under Blue River system exchange and substitution operations. The Blue River exchange allows Denver to continue to operate the Blue River Diversion Project

when its 1946 priorities would otherwise be curtailed by senior downstream calls by releasing water stored in the Williams Fork Reservoir to satisfy downstream senior water rights on the Colorado River. The Blue River substitution is similar to the exchange in that it involves the release of water stored in the Williams Fork Reservoir, albeit at the direction of the U.S. Secretary of the Interior and in substitution for the amount of water that Denver would otherwise owe to Green Mountain Reservoir[5] to complete the annual fill of that reservoir under its more senior (1935) priority. Under this arrangement, Denver releases water from the Williams Fork Reservoir for beneficiaries of Green Mountain Reservoir in substitution for releases that otherwise would be made from Green Mountain Reservoir but for interference by Denver's Blue River Diversion Project.

¶18 Denver has always reused the return flows from water that it imports through the Roberts Tunnel under its 1946 priorities, including water diverted by exchange or substitution using Williams Fork Reservoir water as a substitute supply. From 1989[6] to 2015, Denver imported an average of 5,482 acre-feet per year of water attributable to Blue River exchange and substitution operations, with greater amounts in dry years. Annual return flows from this imported water averaged 2,505 acre-feet during that period.

---

[5] Green Mountain Reservoir is located on the Blue River downstream from Dillon Reservoir. *See* Roberts Tunnel Collection System Map, *infra*. Green Mountain Reservoir generates hydroelectric power through the United States Bureau of Reclamation's Green Mountain Powerplant.

[6] 1989 was the first year Denver separately tracked water imported through the Roberts Tunnel using Williams Fork Reservoir water as a replacement supply.

16

# City and County of Denver
## Board of Water Commissioners
# Roberts Tunnel Collection System



## LEGEND

- Roberts Tunnel Collection System
- Major Lake or Reservoir
- Town
- Continental Divide
- Major Canal or Aqueduct
- Major Stream or River
- Major Highway

1:500,000

0    5    10    20
Miles
Scale number is accurate when printed at 8.5 x 11 inches in size.

N

**DENVER WATER**

*Map Date: 11/6/2015*
*Author: Planning WRGIS*

This Geographic Information Systems (GIS) map and information shown is provided "AS IS" with no claim by the Denver Water Board as to the completeness, usefulness or accuracy of its contents. © 2015 Denver Water

## b. Blue River Decrees

¶19 The Blue River direct flow diversion right and Dillon Reservoir storage rights were decreed by the Summit County District Court in 1952 in Civil Action Nos. 1805 and 1806. These rights were assigned a priority date of June 24, 1946 based on the district court's finding that construction on both the Blue River Diversion Project and Dillon Reservoir commenced on that date. Notably, Denver appealed the Summit County District Court's decision, contending that its priority date should relate back to events earlier than 1946, including to the filing of plats, surveys and construction related to (later abandoned) configurations for the project, and surveys for the Williams Fork River and Fraser River Projects. *City & Cty. of Denver v. N. Colo. Water Conservancy Dist.*, 276 P.2d 992, 999–1002 (Colo. 1954). We rejected those arguments and concluded that "Denver had no fixed and definite plan and no definite point of diversion" for the Blue River prior to 1946. *Id.* at 1003. We affirmed Denver's Blue River rights but remanded the case with instructions to adjudicate rights to Green Mountain Reservoir. *Id.* at 1015.

¶20 On remand to the Summit County District Court, the United States joined the proceeding, and removed Civil Action Nos. 1805 and 1806 to the U.S. District Court for the District of Colorado, where the cases were renumbered 5016 and 5017 and were consolidated with pending Civil Action No. 2782.

¶21 In 1955, the federal district court entered a final decree in the consolidated cases that addressed the rights of several parties to use and store water from the Blue River and other Colorado River tributaries. *See generally* Findings of Fact & Conclusions of Law

18

& Final Decree, *United States v. N. Colo. Water Conservancy Dist.*, Civ. Nos. 2782, 5016, & 5017 (D. Colo. Oct. 12, 1955) (1955 Decree). Much of the 1955 Decree addresses the Colorado-Big Thompson (CBT) Project, which includes Green Mountain Reservoir and transports water from the Colorado River through a series of reservoirs and tunnels to the eastern slope of the Continental Divide. *See generally City of Colo. Springs v. Climax Molybdenum Co.*, 587 F.3d 1071, 1074–77 (10th Cir. 2009) (describing complex procedural history of adjudication and administration of water rights on Blue River).

¶22 The 1955 Decree resulted from a lengthy stipulation that represents a settlement reached by all parties to the consolidated cases regarding Denver's and others' rights in the Blue River. *See* 1955 Decree at 29–43. Under this stipulation, the United States recognized Denver's 1946 Blue River rights decreed by the Summit County District Court in Civil Actions Nos. 1805 and 1806, and Denver agreed that its Blue River rights are subject to the right of the United States to fill Green Mountain Reservoir each year. *Id.* at 31. As relevant here, paragraph 4(c) of the stipulation allows Denver to operate the Blue River system ahead of Green Mountain Reservoir by exchange, using water stored in the Williams Fork Reservoir as a replacement source:

> The City and County of Denver . . . will at all times bypass water in quantities sufficient to meet all legal calls of downstream water rights on the Blue River, and within Colorado below the confluence of that stream with the main stream of the Colorado River, having priorities earlier than the respective priority dates of said cit[y]. This obligation adequately to provide water for the priorities on the Blue River and the Colorado River antedating [Denver's June 24, 1946 priority date] may be fulfilled by replacement storage by and on the Blue River or on the Williams [Fork] River . . . .

19

*Id.* at 32–33. The stipulation requires the U.S. Secretary of the Interior to approve the replacement plan. *Id.* It further requires that "[t]he water to be exchanged shall be on hand and in storage when the exchange is proposed." *Id.* at 33. Finally, the stipulation requires Denver to reuse and make successive use of return flows from the Blue River "so as to reduce or minimize the demands of such city upon Blue River water," *id.* at 35, "within legal limitations and subject to economic feasibility," *id.* at 34.

¶23  After entry of the 1955 Decree, litigation regarding the consolidated Blue River cases continued. As relevant here, references to Denver's right to operate exchanges appear in a string of supplemental orders and decrees. In 1964, the federal district court entered an additional decree reaffirming Denver's "right . . . to exchange water lawfully impounded on the Williams Fork River or Blue River, as provided for in paragraph 4(c) of [the] 1955 stipulation." Decree at 4, *United States v. N. Colo. Water Conservancy Dist.*, Civ. Nos. 2782, 5016, & 5017 (D. Colo. Apr. 16, 1964) (1964 Decree). And in 1978, the federal district court entered a supplemental decree reaffirming that Denver may store water at Dillon Reservoir and propose exchanges of water, subject to the consent of the U.S. Secretary of the Interior, and subject to the release of water to the extent necessary to complete the annual fill of Green Mountain Reservoir. *See* Supplemental Judgment & Decree at 3, *United States v. N. Colo. Water Conservancy Dist.*, Civ. Nos. 2782, 5016, & 5017 (D. Colo. Feb. 9, 1978). In 1991, a Memorandum of Agreement between the United States and Denver affirmed the terms and conditions under which the Williams Fork Reservoir water may be substituted for water otherwise storable in Green Mountain Reservoir, thus

20

allowing Denver to store and use an equivalent amount of water in Dillon Reservoir that would otherwise need to be released from Dillon Reservoir to fill Green Mountain Reservoir. And finally, in 1992, the federal district court entered another decree in the consolidated Blue River cases that specifically addressed the priority date for administration of Denver's Blue River exchange using water from the Williams Fork Reservoir. *See* Findings of Fact, Conclusions of Law & Judgment & Decree, *In re Water Rights of the U.S.*, Civ. Nos. 2782, 5016, & 5017, & No. 88CW382 (D. Colo. Nov. 10, 1992) (1992 Decree). There, the court ordered that "[i]n the administration of exchanges to storage in Dillon Reservoir or diversions through the Harold D. Roberts Tunnel using waters released by Denver from its Williams Fork Reservoir, the State Engineer shall use as the priority of exchange for such purposes the priority date of June 24, 1946 as though adjudicated in the first available adjudication following that date." *Id.* at 10.

¶24    Although from the scattered references in these decrees, it does not appear that the Blue River exchange was formally decreed as an appropriative right of exchange,[7] it is clear that the exchange operations were adjudicated through the various Blue River

---

[7] In the 1992 Decree, the federal district court observed that

> Denver does not here seek to adjudicate an appropriative right of exchange between Williams Fork Reservoir and the Harold D. Roberts Tunnel or Dillon Reservoir. Instead, Denver claims to make such exchanges by the exercise of the right decreed to its Williams Fork Reservoir after complying with the requirements of paragraph 4(c) in the 1955 Stipulation and paragraphs 2 and 5 of the 1964 Decree in the Consolidated Cases.

1992 Decree at 3–4.

decrees and are administered under a June 24, 1946 priority, consistent with the appropriation date awarded to the Blue River system rights in Civil Action Nos. 1805 and 1806.

¶25   With this background in mind, we now turn to the 1940 Agreement.

## B. The 1940 Agreement

¶26   Denver operates three large streambed reservoirs in the South Platte River Basin on the eastern slope: the Antero, Cheesman, and Eleven Mile Canyon Reservoirs. Denver operates these reservoirs on a gauge-height basis, which means the inflow and outflow to these reservoirs is regulated to maintain water stored in the reservoirs at a steady gauge height. This method makes no adjustments or releases to offset evaporation losses, however, and the burden of such evaporation is borne by downstream appropriators. Although the State Engineer now has statutory authority to order releases from reservoirs to compensate for evaporation losses, *see* § 37-84-117(5), C.R.S. (2018),[8] at the time of the 1940 Agreement, the State Engineer did not charge streambed reservoirs for evaporation or seepage losses. *Consolidated Ditches*, 807 P.2d at 27.

---

[8] Section 37-84-117(5) provides:

> The state engineer may order that an owner of a reservoir release an amount of water from the reservoir that, in the determination of the state engineer, is necessary to prevent evaporation on the surface of the reservoir from depleting the natural flow of the stream running through the reservoir that would otherwise be available for use by other appropriators.

¶27 Concerned about these losses that the reservoirs were causing to the South Platte River, particularly given the addition of the Eleven Mile Canyon Reservoir to this system, several irrigation companies banded together as Consolidated Ditches Company of District No. 2 to negotiate with Denver to replace these losses. These negotiations led to the 1940 Agreement between Denver, Consolidated Ditches, its individual members, and the State Engineer.

¶28 The preamble to the 1940 Agreement states that the parties desired to "adjust, settle and determine all differences between [them] respecting seepage and evaporation from streambed reservoirs of the City and County of Denver now in existence." The preamble also observed that it was the State Engineer's practice not to charge streambed reservoirs for seepage or evaporation losses and that the operation of Denver's reservoirs was creating a burden on appropriators. In recognition of this situation, under section 4 of the 1940 Agreement, Denver agreed not to reuse imported water[9] as follows:

---

[9] As a general rule, appropriators of water have no automatic right to reuse or successively use water after its initial application to a beneficial use, and the return flows become tributary to the stream, subject to diversion and use under existing priorities. *City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 65 (Colo. 1996). However, a different standard has developed for "foreign" or "imported" water brought into a watershed or stream system from an unconnected source, such as water brought from the western slope to the eastern slope using transmountain tunnels. *Id.* at 66. Our statutes and case law establish "a right of reuse for importers of transmountain water that does not exist for appropriators of native water." *Id.* at 68; *see also* § 37-82-106(1), C.R.S. (2018) ("Whenever an appropriator has lawfully introduced foreign water into a stream system from an unconnected stream system, such appropriator may make a succession of uses of such water by exchange or otherwise . . . ."); *Town of Estes Park v. N. Colo. Water*

It is understood and agreed that the City and County of Denver may make or permit any nonconsumptive use of water to create electric power, to dilute sewage, or the like while such water is on its way to its place of principal and ultimate beneficial use; and *the City agrees that it will not use or attempt to use or lease any water, irrespective of source, which shall have been once used through its municipal water system and such water shall be allowed to become part of the nearest convenient natural water course.*

(Emphasis added.)

## C. The *Fulton* Decision

¶29 This restriction on Denver's reuse of return flows under section 4 of the 1940 Agreement has generated substantial litigation, starting in the 1970s with *Fulton Irrigating Ditch Co.*, 506 P.2d 144. *Fulton* concerned a 1969 agreement between Denver and Coors Brewing Company, under which Coors was to divert water at the confluence of Clear Creek and the South Platte River, and Denver was to replace that water with water imported from the western slope that had been used in a sewage plant and discharged as effluent. *Id.* at 151. Several ditch company signatories to the 1940 Agreement challenged this arrangement as violating the 1940 Agreement. *Id.* at 146. We held that Denver, in the absence of an agreement to the contrary, had the right to reuse and successively use water that it imported from the western slope. *Id.* at 146, 149. However, we also upheld

---

*Conservancy Dist.*, 677 P.2d 320, 326 (Colo. 1984) ("Subject to contractual obligations, . . . a developer of foreign water has the right to use, reuse, successively use, and dispose of such water."). Thus, the restriction on reuse and leasing of return flows in section 4 of the 1940 Agreement limits Denver's right as an importer of foreign water to reuse and make successive uses of water it imports from the western slope. In the absence of this contractual limitation, Denver has the right to reuse water it imports to the eastern slope. § 37-82-106(1); *Fulton Irrigating Ditch Co.*, 506 P.2d at 147–49.

the validity of the 1940 Agreement and concluded that Denver could not exchange water under the Coors agreement. *Id.* at 146, 153.

¶30    In dicta, this court identified two potential future issues regarding the scope of the 1940 Agreement. First, we noted the "windfall" or "bonanza" problem caused by a potential increase in water importation, but not in evaporation losses:

> We can visualize that the amount of foreign water returned to the river after use far exceeds the evaporative loss from Denver's streambed reservoirs. If so, the effect of the 1940 agreement is to create a bonanza for the defendants and other downstream users at the expense of Denver and Western Colorado.

*Id.* at 153. We observed, however, that Denver had not sought a determination of whether the disparity between return flows and evaporation losses rendered the 1940 Agreement void as against public policy by reason of wastage. *Id.* Additionally, we raised, but did not address, whether the 1940 Agreement applied to water that had not been appropriated when the Agreement was made:

> [T]he plaintiffs did not request in their declaratory judgment action a determination of whether the 1940 agreement . . . applies to water not appropriated at the time the agreement was made. We, of course, can express no opinion concerning [this] possible contention[].

*Id.*

### D. Case No. 81CW405: The *Consolidated Ditches* Litigation

¶31    We had the opportunity to address these issues in *Consolidated Ditches*, 807 P.2d 23. The dispute in that case concerned Denver's application in Case No. 81CW405 (Water Division 1) for approval of a plan to reuse effluent from transmountain sources—including the Blue River, the Williams Fork River, and the Fraser River—in an

25

augmentation plan for golf course irrigation wells. *Id.* at 25, 30, 32. Consolidated Ditches opposed the application, arguing that the 1940 Agreement prohibited Denver from reusing any transmountain return flows. *Id.* at 25.

¶32 Following a lengthy trial, the water court issued detailed factual findings and legal conclusions regarding the scope of the 1940 Agreement. As relevant here, the water court reasoned that the principal purpose of the 1940 Agreement was to "eliminate the burden on the [South Platte R]iver caused by evaporation from the streambed reservoirs," and that it was "reasonable to assume that [the parties] anticipated that the gain to the river from the agreement would be roughly equivalent to the loss from evaporation." The water court concluded that the goal of the 1940 Agreement would be achieved by limiting its effect "to waters [that] were appropriated at the time it was executed" and by construing the 1940 Agreement not to apply to waters appropriated or acquired by Denver after May 1, 1940. *Id.* at 25, 31.

¶33 Based on the evidence before it, the water court found that in 1940, Denver imported 38,672 acre-feet of water from the Fraser River and Williams Fork River Diversion Projects, which resulted in 12,506 acre-feet of effluent return flow. *Id.* at 36. By comparison, the estimated evaporation losses from the three streambed reservoirs amounted to 10,142 acre-feet. *Id.* Thus, in 1940, the return flows exceeded evaporation losses by 2,364 acre-feet, or approximately 123%. *See id.* at 26. By comparison, in 1978, Denver imported 224,240 acre-feet from the Colorado River system (two-thirds of which came from the Blue River Diversion Project), resulting in return flows of 74,110 acre-feet,

26

as compared to streambed reservoir evaporation losses of approximately 13,911 acre-feet. *Id.* at 36. Thus, in 1978, the return flows from all imported water exceeded evaporation losses by 60,199 acre-feet, or 532.7%. *See id.*

¶34 The water court observed that in 1940, the parties were considering a joint development of Blue River resources and that it must have been evident that if those resources were developed, large quantities of Blue River water would be available for importation into the South Platte Basin. In other words, it was likely that importation of transmountain water would grow, yet the amount of evaporation from the streambed reservoirs would likely continue at historic rates. *Id.* at 31. Given the quantity of water that could be available for reuse, there was no reason to believe that Denver would intend to confer such a "bonanza" on Consolidated Ditches in the form of additional return flows. *Id.* In short, it seemed "dubious that Denver would agree—or Consolidated Ditches expect—that an ever[-]increasing price be paid for a static benefit." *Id.*

¶35 The water court concluded that the circumstances surrounding the 1940 Agreement showed that "the parties were attempting to solve the problem of evaporation as it existed at that time, and did not intend that the agreement should bind water appropriated in the future." *Id.* The water court thus decreed, as relevant here, that the Agreement did not prohibit Denver from reusing, successively using, and disposing of return flows from water derived from decreed Colorado River sources with appropriation dates subsequent to May 1, 1940, or with respect to water rights acquired by Denver subsequent to that date. *Id.* It reasoned that its interpretation was fair to both

27

parties, noting that although the return flows from pre-1940 western slope appropriations result in "somewhat of a bonus" to Consolidated Ditches, "the divergence is not unreasonable." *Id.*

¶36    Both Denver and Consolidated Ditches appealed parts of the water court's ruling to this court. *Id.* at 26. As relevant here, we acknowledged that the principal purpose of the 1940 Agreement was to eliminate the burden on the South Platte River from evaporation losses, *id.* at 36, and upheld the water court's ruling that the 1940 Agreement only precludes Denver from "reusing, successively using, or disposing of effluent return flows derived from decreed water rights from Colorado River sources with appropriation dates preceding May 1, 1940," *id.* at 26. Thus, per the water court's decree, the 1940 Agreement does not prohibit Denver from reusing return flows from water derived from Colorado River sources with appropriation dates after May 1, 1940, or with respect to water rights acquired by Denver after that date. *Id.* at 31.

¶37    In examining whether existing disparities between evaporation losses and return flows from sources subject to the 1940 Agreement rendered the agreement void by reason of wastage, we reviewed the water court's findings regarding amounts of water imported in 1940 from the Fraser River and Williams Fork River Diversion Projects as compared to amounts imported in 1978. *Id.* at 36. In so doing, we recognized that water from the Blue River Diversion Project is not subject to the 1940 Agreement. *Id.* Specifically, we observed that "[o]f the 224,240 acre-feet of transmountain water imported by Denver in 1978, . . . almost two-thirds . . . came from *the Blue River Diversion Project, which had an*

28

*appropriation date of June 24, 1946, and was not subject to the 1940 agreement.*" *Id.* (emphasis added). However, we did not discuss exchange operations in our decision, and thus, it is not clear from *Consolidated Ditches* how the Agreement applies to water diverted by exchange or substitution.

## II. Procedural History

¶38 Having provided the extensive but necessary background to understanding the issues before us, we turn to the procedural history of this case. First, we discuss the bifurcation of the issues here from the underlying LIRF case. Then we discuss the parties' competing motions under C.R.C.P. 56 and the water court's rulings.

## A. Bifurcation of Issues Regarding the 1940 Agreement from the Underlying LIRF Case

¶39 As previously noted, the issues in this appeal initially arose in Denver's application in Case No. 04CW121 to adjudicate and quantify reusable LIRFs for use in exchanges and augmentation plans. Among the claims for relief in its application, Denver sought confirmation that the Williams Fork Reservoir water was not subject to the 1940 Agreement or the ruling in Case No. 81CW405 "if exchanged to another structure acquired after 1940 or under an exchange priority junior to May 1, 1940"—in other words, if used as a substitute supply for water delivered through the Roberts Tunnel in Blue River exchange operations. Consolidated Ditches objected to Denver's inclusion of return flows from Blue River exchange operations using water stored in the Williams Fork Reservoir as a substitute supply, arguing that the 1940 Agreement barred the reuse of such return flows. Denver then filed an unopposed motion to bifurcate these issues.

29

On January 12, 2012, the water court granted Denver's motion and bifurcated the following issues into this case, No. 12CW05:

> All issues involving the scope and effect of the 1940 Agreement, including but not limited to the issue of whether water rights decreed in [Civil Action No.] 657, Grand County District Court, are not subject to the 1940 Agreement if stored in Dillon Reservoir by exchange from Denver Water's 1935 Williams Fork Reservoir priority, and imported to the east slope through the Roberts Tunnel.

¶40 All objectors who were parties in Case No. 04CW121 were made parties to Case No. 12CW05. The water court then entered a decree in the LIRF case on May 15, 2012. Paragraph 24.5 of that decree provided that Denver and Consolidated Ditches had stipulated that Denver would reduce the amount of its reusable LIRFs by 8.3% (a stipulated approximate measure of the disputed LIRFs) until the bifurcated issues in Case No. 12CW05 were resolved.

## B. The Parties' C.R.C.P. 56 Motions

¶41 As this case proceeded, Denver filed a C.R.C.P. 56(h) motion for determination of a question of law, asking the water court to determine whether the 1940 Agreement prevents Denver from reusing return flows from water imported from the western slope under the Blue River system exchange using water released from the Williams Fork Reservoir as a source of substitute supply. Consolidated Ditches filed a competing C.R.C.P. 56(c) summary judgment motion on the same issue. Whether the 1940 Agreement applies to this imported water determines whether Denver may reuse or successively use the water and, thus, whether it may include the water in its quantification of reusable return flows in the LIRF case. Opposer Central Colorado Water

30

Conservancy District (Central) filed a response to Denver's motion, and West Slope Amici[10] filed an amicus curiae brief in opposition to Consolidated Ditches' motion.

## C. The Water Court's Rulings

¶42 On July 12, 2016, the water court issued an order resolving the parties' C.R.C.P. 56 motions, ruling that Denver's Blue River system water right, which was decreed in 1955 with an appropriation date of June 24, 1946, is a source of water that was not owned, appropriated, or acquired by Denver prior to May 1, 1940, and therefore is not subject to the 1940 Agreement. It concluded that "the Blue River System water imported by Denver has a priority date of 1946, regardless of whether Denver imports the water after diversion in priority or after an out-of-priority diversion enabled by Denver's decreed exchange plan, with substitute water released from [the] Williams Fork Reservoir." The water court therefore held that Denver may reuse or successively use imported water attributed to the Blue River system. The court rejected Consolidated Ditches' argument that the "character of exchange" principle renders the 1935 priority of the Williams Fork Reservoir substitute supply the "operative right" for purposes of the 1940 Agreement. Instead, the court reasoned, the relevant date for determining whether the 1940 Agreement applies is the 1946 administrative priority date of Denver's Blue River

---

[10] West Slope Amici include the Colorado River Water Conservation District, Board of County Commissioners of Summit County, Middle Park Water Conservancy District, Eagle River Water & Sanitation District, Upper Eagle Regional Water Authority, Grand Valley Water Users Association, Orchard Mesa Irrigation District, Ute Water Conservancy District, and Palisade Irrigation District.

exchange, not the 1935 priority date under which Denver stores water used for substitute supply.

¶43     Denver and Consolidated Ditches agreed that the July 12, 2016 Order resolved the issues that would be contested at trial, and Denver moved for entry of decree based on the water court's order. Central opposed Denver's proposed decree, arguing that the decree should include additional terms and conditions requiring Denver to import a certain amount of water through the Moffat Tunnel—water that is subject to the 1940 Agreement and may not be reused.

¶44     On September 25, 2016, the water court issued an order resolving Central's opposition and rejecting Central's request for additional decree language. The water court concluded that even in the absence of a decree condition that Denver import a specific amount of nonreusable western slope water each year, ample safeguards already ensure that Denver replaces evaporation depletions. Further, the water court reasoned, Central's requested decree condition would require Denver to import far more nonreusable water than it had imported in 1940, and would thus result in an "even larger windfall" of imported water deposited into the South Platte watershed compared to the evaporation losses the 1940 Agreement addressed.

¶45     On September 30, 2016, the water court entered its final decree, which adopted its findings and conclusions regarding the 1940 Agreement from its July 12, 2016 Order. The water court reiterated that the Blue River water imported by Denver has a priority date of 1946, regardless of whether Denver imports the water after diversion in priority, or by

32

exchange or substitution using water released from the Williams Fork Reservoir. Thus, the water court concluded, water diverted from the Blue River is not subject to the 1940 Agreement, and "Denver may reuse or successively use that water, provided such uses are consistent with the Blue River Decree." The water court further ordered that the LIRF decree in case No. 04CW121 be modified to remove the 8.3% reduction in Denver's amount of reusable LIRFs pending resolution of the issues bifurcated into case No. 12CW05.

¶46 Consolidated Ditches appealed and asks this court to reverse the water court's determination that the Blue River water diverted by exchange or substitution is not subject to the 1940 Agreement. Additional parties and amici ask this court either to reverse or affirm the water court's ruling for various reasons.[11] Our analysis below addresses the substantive arguments made by Consolidated Ditches and other parties regarding the application of the 1940 Agreement in this dispute. To the extent that we have not expressly addressed other arguments made by the parties or amici, we note that we have considered these arguments and found them to be either unpersuasive or beyond the scope of the water court's orders being appealed.

---

[11] In addition to Consolidated Ditches and Denver, we received briefing from Opposers-Appellants Central Colorado Water Conservancy District, the City of Aurora, Farmers Reservoir and Irrigation Company, and Parker Water and Sanitation District, as well as Opposers-Appellees Northern Colorado Water Conservancy District and the State Engineer and Division Engineer for Water Division 1. We also received briefing from West Slope Amici and the City of Colorado Springs.

## III. Analysis

¶47 As discussed above, our decision in *Consolidated Ditches* established that the 1940 Agreement applies only to return flows derived from decreed water rights from Colorado River sources with appropriation dates before May 1, 1940; Denver may reuse or successively use return flows derived from sources that were appropriated or acquired after that date. The question before us now is whether the 1940 Agreement prevents Denver from reusing return flows derived from water imported through the Roberts Tunnel under Blue River exchange and substitution operations using Williams Fork Reservoir water as a replacement source.

¶48 As discussed above, water in the Williams Fork Reservoir physically cannot be delivered transmountain because it sits below the Williams Fork and Fraser River collection systems. The question here is whether the reuse prohibition in the 1940 Agreement applies when the Williams Fork Reservoir water is used instead as a source of replacement supply in exchange and substitution operations.

¶49 Denver argues that the return flows at issue are derived from the Blue River exchange operations, which were adjudicated in the 1955 Decree and are administered under a 1946 priority. Denver contends that because the Blue River exchange is a source that was acquired after May 1, 1940, it is not subject to the 1940 Agreement.

¶50 Consolidated Ditches argues that the return flows are derived from the Williams Fork Reservoir water, which has a 1935 priority date, and therefore, these return flows are subject to the 1940 Agreement. Consolidated Ditches' argument rests squarely on

application of the so-called "character of exchange rule," the notion that water diverted by exchange takes on the "character" of the substitute supply. Under this view, the Williams Fork Reservoir substitute supply is "moved" (by legal fiction) to the upstream diversion point, such that the water taken at that point by exchange takes on the "character" of that substitute supply. In other words, under the legal fiction created by the exchange, the water taken at the Blue River upstream diversion point is effectively the Williams Fork Reservoir substitute supply water, and the reuse prohibition in the 1940 Agreement applies to that water when it is imported through the Roberts Tunnel because the water's 1935 date of appropriation predates the 1940 Agreement.

¶51 We disagree with Consolidated Ditches and conclude that, for purposes of the 1940 Agreement, the water imported through the Roberts Tunnel under Blue River exchange and substitution operations is a source acquired by Denver after May 1, 1940. Accordingly, the return flows from those operations are not subject to the 1940 Agreement, and Denver may reuse or successively use them. At the time of the 1940 Agreement, Denver could not import water through the Roberts Tunnel by exchange (or otherwise). Denver's ability to divert water from the Blue River system by exchange or substitution using Williams Fork Reservoir water as a substitute supply was adjudicated in the 1955 Decree, and the exchange is administered under a June 24, 1946 priority, consistent with the appropriation date of Denver's rights in the Blue River system.

¶52 We further disagree with Consolidated Ditches that we must apply the "character of exchange rule" here. Nothing in statute mandates that water diverted by exchange

35

must take on the "character" of the substitute supply, and although we have acknowledged the concept in past cases, we have never expressly applied it or defined its scope. We therefore decline to adopt a mandatory character of exchange "rule" that applies rigidly to all exchange operations. Whatever its scope or applicability in other circumstances, the character of exchange principle is unnecessary here to ensure that the purpose of the 1940 Agreement is fulfilled or to avoid injury to Consolidated Ditches. Accordingly, we affirm the judgment and decree of the water court.

## A. Standard of Review

¶53 We review a water court's resolution of questions of law in competing C.R.C.P. 56 motions de novo. *City & Cty. of Denver v. City of Englewood*, 2013 CO 50, ¶ 15, 304 P.3d 1160, 1164; *see also Select Energy Servs., L.L.C. v. K-LOW, L.L.C.*, 2017 CO 43, ¶ 12, 394 P.3d 695, 698 ("This court reviews a grant of summary judgment de novo, and all doubts as to the existence of a triable issue of fact must be resolved against the moving party."). Similarly, the interpretation of a contract is a question of law we review de novo. *Fed. Deposit Ins. Corp. v. Fisher*, 2013 CO 5, ¶ 9, 292 P.3d 934, 937.

## B. Exchanges

¶54 We begin with a brief review of exchanges. An exchange is a water management practice administered by the State Engineer that allows a junior appropriator to divert water out of priority by introducing a substitute supply above the downstream senior calling right. *See* §§ 37-83-104, -80-120(2)–(4), C.R.S. (2018); *Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1155 (Colo. 2001). By making a sufficient substitute supply

available to the downstream senior appropriator, the junior appropriator may continue to divert, at its decreed point of diversion, water that it would otherwise have to allow to pass to the downstream diversion point of the senior calling right. *Empire Lodge*, 39 P.3d at 1155. Per statute, the replacement water is provided as a substitute for the water diverted upstream. § 37-80-120(2)–(4). Because it is provided in lieu of the water being diverted upstream, the substitute supply must mimic the water at the upstream diversion point in terms of quality, quantity, and continuity to meet the requirements of the downstream calling right, without impairing the rights of others. *See* § 37-80-120(3) (requiring substituted water to be of a "quality and continuity" to meet requirements of senior appropriator's use); § 37-92-305(5), C.R.S. (2018) (requiring substituted water to be of a "quality and quantity" to meet requirements for which senior appropriator's water normally has been used). An exchange reduces the amount of water available for beneficial use in the specific stream reach between the upstream diversion point and the downstream introduction of the substitute supply, but neither increases nor decreases the physical supply of water. *Colo. Water Conservation Bd. v. City of Central (City of Central)*, 125 P.3d 424, 436 (Colo. 2005).

¶55    We observed in *Empire Lodge* that there are four critical components of an exchange. 39 P.3d at 1155 (citing Casey S. Funk & Amy M. Cavanagh, *Basic Exchange 101*, 1 U. Denv. Water L. Rev. 206, 207 (1998)). First, the source of substitute supply must be above the calling water right. *See* § 37-80-120(2) (requiring the substitute supply to be provided to more senior appropriators); § 37-83-104 (allowing a reservoir owner to

deliver stored water into the public stream to supply appropriations from said stream and to take an equal amount "higher up"); § 37-92-305(5) ("Substituted water shall be accepted by the senior appropriator . . . ."). Second, the substitute supply must be equivalent in amount and of suitable quality to the downstream appropriator. § 37-80-120(3) (providing that substituted water must be of a "quality and continuity" to meet requirements of senior appropriator's use); § 37-92-305(5) ("quality and quantity"). Third, there must be available natural flow at the point of natural upstream diversion. § 37-80-120(4) (providing that supplier of substitute water may take equivalent amount for beneficial use "to the fullest extent possible without impairing the availability of water lawfully divertible by others"); § 37-83-104 (allowing diversions "higher up" if no injury to others); § 37-92-305(5) (permitting supplier of substitute water to take equivalent amount at his point of diversion or storage if such water is available without impairing the rights of others). Fourth, the rights of others cannot be injured when implementing the exchange. § 37-80-120(4) (allowing supplier of substitute water to take equivalent amount for beneficial use "to the fullest extent possible without impairing the availability of water lawfully divertible by others"); § 37-83-104 (permitting appropriator to take by exchange "[w]hen the rights of others are not injured thereby").

¶56 Although the State Engineer may allow the operation of the exchange in the absence of a decree confirming it, *Empire Lodge*, 39 P.3d at 1155, "a practice of substitution or exchange may constitute an appropriative water right and may be adjudicated as any other water right," *City of Central*, 125 P.3d at 436. Where an exchange is adjudicated, it

38

receives a priority date consistent with the date it began operating, without application of the postponement doctrine. *Empire Lodge*, 39 P.3d at 1155; *City of Central*, 125 P.3d at 436, 442 n.4. In *City of Central*, relying on the statutory language in section 37-80-120(4), we rejected the argument that water exchanges obtain priority dates only vis-à-vis other exchanges, rather than the entire stream system. *See* 125 P.3d at 436, 442 n.4. Instead, we concluded that the adjudication of an exchange assigns it a priority date against the entire stream system like any other appropriative right. *Id.* The priority date for an adjudicated exchange secures the appropriator's right to operate the exchange against other appropriative rights on the stream system, and represents the date the appropriator provided adequate notice of its intent to operate an exchange and the scope of such an exchange. *See id.* at 443–44.

## C. The Character of Exchange "Rule"

¶57 Consolidated Ditches argues that the 1940 Agreement prohibits Denver from reusing the return flows from Blue River exchange and substitution operations because, under the so-called "character of exchange rule," the water diverted from the Blue River system and imported through the Roberts Tunnel takes on the "character" of the Williams Fork Reservoir substitute supply released under those operations. Thus, Consolidated Ditches argues, the return flows from water imported through the Roberts Tunnel under Blue River exchange and substitution operations are subject to the 1940 Agreement because they are derived from Williams Fork Reservoir water, which is a source that was appropriated prior to May 1, 1940.

39

¶58 The origins of the "character of exchange rule" are somewhat of a mystery. The "rule" exists nowhere in our state statutes. Nothing in the many statutory provisions addressing exchange operations requires the water diverted upstream to take on the character of the downstream substitute supply. These statutory provisions instead reflect that the substitute supply must mimic the water taken at the upstream diversion point in terms of quality, quantity, and continuity to meet the requirements of the downstream calling right. *See* § 37-80-120(3) ("Any substituted water shall be of a quality and continuity to meet the requirements of use to which the senior appropriation has normally been put."); § 37-92-305(5) ("[S]ubstituted water shall be of a quality and quantity so as to meet the requirements for which the water of the senior appropriator has normally been used . . . .").

¶59 The notion that water diverted by exchange takes on the character of the substitute supply seems to emanate from the view of an exchange as the equivalent of "moving" the substitute supply (by legal fiction, instead of an actual pump and pipeline) to the upstream diversion point. In other words, the water taken by exchange at the upstream diversion (exchange-to) point is effectively the substitute supply. This court has never formally endorsed this legal fiction, however.

¶60 Not only is the "character of exchange" principle absent from our statutes, it is unclear what is meant by the "character" of the substitute supply. The briefing before us reveals disagreement over the scope of that term, and whether it refers simply to the type of source (e.g., foreign, nontributary, fully consumable native water), or more broadly

40

encompasses benefits attached to the substitute supply (such as the right of reuse or a succession of uses), priority dates, decretal restrictions (such as type or place of use), contractual limitations, or simply "all legal characteristics."

¶61 Our cases have mentioned the character of exchange principle only twice, in *City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1 (Colo. 1996), and *Centennial Water & Sanitation District v. City & County of Broomfield (Centennial)*, 256 P.3d 677 (Colo. 2011). But in neither case did we expressly apply the principle or hold that it functions as a mandatory "rule" applicable to all exchange operations. Nor did we purport to define the "character" of water encompassed by the concept or suggest that it applies to substitutions.

¶62 Our first mention of the character of exchange principle appeared in *Bijou*, where it came up twice. In that case, Thornton had acquired shares of CBT water and other assets from the Water Supply and Storage Company (WSSC). 926 P.2d at 19–20, 54. WSSC obtained the CBT water under an Allotment Contract with the Northern Colorado Water Conservancy District (NCWCD). *Id.* at 54–55. Under that contract, "all lands, facilities, and serviced areas which receive benefit from the allotment [of CBT water] (whether water service is provided by direct delivery, by exchange, or otherwise) shall be situated within the boundaries of [NCWCD]." *Id.* at 58–59. Thornton proposed an internal ditch exchange that would pump CBT water outside the boundaries of NCWCD and replace it with water from Thornton's other rights. *Id.* at 54.

¶63 Thornton contended that the character of exchange principle should apply to permit its extra-district use of CBT water, arguing that the "substitute supply water

41

becomes CBT water through the 'character of exchange' rule."[12]  *Id.*  Thus, it argued, although CBT water would physically leave the boundaries of NCWCD under its proposed plan, the water remained in the district for purposes of legal analysis.  *Id.*

¶64    The water court rejected Thornton's argument, labeling the character of exchange rule a "'legal fiction' that cannot disguise the removal of CBT water from the district."  *Id.* at 55.  We affirmed, holding that the proposed exchange would result in benefits to Thornton outside the district, a result prohibited by the contract and applicable NCWCD rules, regardless of whether the character of exchange rule applied.  *Id.* at 59.  Thus, we concluded that "we need not discuss the applicability or validity of this rule."  *Id.* at 60 n.51.

¶65    The character of exchange principle also came up in our discussion of Thornton's proposed change of certain seepage water rights to municipal uses.  *Id.* at 61.  The seepage rights consisted of return flows from irrigation that relied in part on water diverted by exchange using CBT water rights as a source of downstream substitute supply.  *Id.*  The water court prohibited Thornton from taking seepage water for municipal use outside the district to the extent that it was derived from CBT water.  *Id.*  We observed that the water court "apparently applied the character of exchange rule" to classify the irrigation water diverted by exchange as CBT water.  *Id.*  We then affirmed the water court's denial

---

[12] Under Thornton's articulation, the CBT water "trades places" with the down-ditch replacement supply, such that the substitute supply takes on the character of the water diverted upstream and vice-versa.

of Thornton's proposed "change of use and subsequent extra-district use of return flows deriving from irrigation with CBT water." *Id.* Looking to the contractual limitations on that water, including a provision that specifically addressed the use and reuse of seepage and return flows attributable to the use of CBT water, *id.* at 61 & n.52, we concluded that we could not approve Thornton's proposed change of use and credit for return flows "to the extent that these flows consist of CBT water," *id.* at 62. Thus, we affirmed the trial court's denial of seepage credit from CBT waters to Thornton. *Id.*

¶66 This holding could be viewed as an implied application of the character of exchange principle to preserve contractual restrictions on a substitute supply, although we did not expressly rely on the principle in our reasoning. Certainly the driving factor in that ruling was the clear intent to keep all benefits from the CBT water within the district. That said, reliance on the character of exchange principle was not necessary to conclude that Thornton's proposed change of use of the accrued seepage for municipal purposes amounted to an extra-district benefit from the use of CBT water. In other words, the use of CBT water as in-district replacement in the irrigation exchange would have produced (prohibited) benefits to Thornton outside the district regardless of whether the irrigation water diverted by exchange took on the character of the CBT water used as a substitute supply.

¶67 More recently, in *Centennial*, we stated the rule, but did not apply it, and it was not necessary to our holding in that case. 256 P.3d at 684. *Centennial* concerned whether Broomfield could satisfy the "can and will" test and the "first step" requirement for its

43

application for conditional appropriative rights of exchange. *Id.* at 680. In discussing the difference between a plan for augmentation and a conditional appropriative right of exchange, we explained:

> In contrast [to a plan for augmentation], an appropriative right of exchange allows a strict one-to-one diversion of upstream water in exchange for providing continuity with a source of substitute supply at a point downstream, in an amount and of a quality suitable to what would have been available to water users in that location. *Empire Lodge*, 39 P.3d at 1155. *The diversions at the upstream point take on the character of the water right used as a source of downstream substitute supply. Id.* Therefore, an operating exchange will reduce stream flow only in the exchange reach—i.e., the segment of river between the downstream source of substitute supply and the upstream point of diversion—and will only create a limited potential for injury.

*Id.* at 684 (emphasis added). This reference to the character of exchange principle appeared in a general discussion of exchanges. And importantly, our holding in that case did not concern the resulting characteristics of water diverted by exchange. Moreover, although we cited *Empire Lodge*, 39 P.3d at 1155, for this articulation of the character of exchange principle, our discussion there focused on the "four critical elements" of an exchange. Thus, to the extent we relied on *Empire Lodge* in *Centennial*, we were referring to an exchange operator's upstream diversions being limited by the amount and quality of water that the exchange operator is able to substitute downstream.

¶68 Later in *Centennial*, in rejecting Broomfield's argument that the water court erred in analyzing its proposed sources of supply individually, we explained why the water court correctly analyzed whether each individual proposed source was non-speculative:

> *Because exchanges involve a delivery of substitute supply water to the stream and continuity with an upstream diversion, a non-injurious diversion at the upstream*

*point must take on the character of the water right used as a source of downstream substitute supply. See Empire Lodge*, 39 P.3d at 1155. Therefore, a municipality's entitlement to a conditional decree for appropriative rights of exchange is subject to the water court's determination that the applicant intends to acquire and can and will acquire suitable sources of substitute supply.

*Centennial*, 256 P.3d at 686 (emphasis added). There, we referenced the character of exchange principle in the context of our conclusion that a source-by-source analysis of substitute supplies is required to determine whether an appropriator has fulfilled the "can and will" and "first step" requirements. *See id.* Again, we cited *Empire Lodge. Id.* But we did not actually apply the character of exchange principle in *Centennial* to decide whether a particular *use* of water diverted by exchange was foreclosed. *See id.* Nor did we explain what is meant by the "character" of the substitute supply. *See id.*

¶69     That said, we have implicitly relied on the character of exchange concept in at least two cases to ensure that an importer of water retains the full benefit of the reusability of that imported water. *See* § 37-82-106(1), C.R.S. (2018) (permitting importer of foreign water to "make a succession of uses of such water by exchange or otherwise"). In *Water Supply & Storage Co. v. Curtis*, for example, the character of exchange principle arguably undergirded our holding that the reusable nature of imported water used as a substitute supply carried through to the water stored by exchange in that case. *See* 733 P.2d 680, 685 (Colo. 1987). Similarly, in *City of Florence v. Board of Waterworks*, we acknowledged that the reusability of the substitute supply (return flows attributable to foreign water) carried through to water stored by exchange in reservoirs. 793 P.2d 148, 149–52 (Colo. 1990). There, we held that the water stored by exchange could be reused or successively used to

45

extinction. *Id.* at 153. Arguably, this result relied at least in part on a character of exchange principle.

¶70 Despite the absence of guidance from the legislature or this court, the "character of exchange" concept appears to have emerged as an unofficial, yet widespread, permissive practice recognized by the State Engineer. *See* Ans. Br. Appellees State Engineer & Division Engineer, Water Division 1, at 29 ("As the administrators of exchanges, the Engineers know of no mandatory character-of-exchange rule, but have regularly permitted the water diverted upstream to take on the character of the substitute supply as necessary to accomplish an appropriator's non-speculative purposes, consistent with water court decrees, and without impairment to the rights of others.").

¶71 We conclude that, at a minimum, the character of exchange concept reflects the statutory requirements applicable to a substitute supply. That is, an exchange operator's upstream diversions are limited by the amount and quality of water the operator is able to substitute downstream, which avoids injury by ensuring that the downstream senior appropriator receives water comparable to what would have been available had the upstream diversion not occurred. Beyond that, the character of exchange concept serves as a flexible tool to preserve the fully reusable character of transmountain water used as a substitute supply in exchanges, *see* § 37-82-106(1), consistent with Colorado's longstanding water management policy of maximizing the beneficial use of waters in the state, *see* § 37-92-102(1)(a), C.R.S. (2018); *Frees v. Tidd*, 349 P.3d 259, 263 (Colo. 2015). It also functions as an administrative tool for the State and Division Engineers to accurately

46

account for water stored in reservoirs throughout the state. And it may, in some instances, serve to preserve decretal limitations or contractual restrictions on a substitute supply. *See Bijou*, 926 P.2d at 61–62.

¶72    But in the absence of legislative guidance, we decline to hold that the character of exchange concept functions as a mandatory rule that rigidly applies to all exchange operations, or even that it necessarily always encompasses "all legal characteristics" of the substitute supply. Such a mandatory rule would neither cultivate flexibility nor optimize the beneficial use of the state's waters.

### D. Water Imported Under Blue River Exchange and Substitution Operations Is Not Subject to the 1940 Agreement

¶73    Turning now to the present dispute, we conclude that the water court correctly determined that the 1940 Agreement does not apply to prohibit Denver from reusing or successively using water imported under Blue River exchange and substitution operations using Williams Fork Reservoir water as a substitute supply.

¶74    Importations under Blue River exchange and substitution operations could not occur without an upstream diversion (exchange-to) point. However, at the time it entered the 1940 Agreement, no upstream diversion point existed; Denver had not shown an intent to divert water from the Blue River system at that time (by exchange or otherwise). *See N. Colo. Water Conservancy Dist.*, 276 P.2d at 998, 1003 (rejecting Denver's argument to treat the Blue River project, the Williams Fork project, and the Fraser River project as units of a single project, given that the Blue River involves a separate stream and tunnel system; concluding that "Denver had no fixed and definite plan and no definite point of

47

diversion" on the Blue River prior to 1946). Denver's ability to divert water from the Blue River system by exchange or substitution using Williams Fork Reservoir water as a source of substitute supply was first adjudicated in 1955, and the exchange is administered under a June 24, 1946 priority, consistent with the appropriation date of Denver's rights in the Blue River system—the date construction on that transmountain system commenced. Thus, we conclude that for purposes of the 1940 Agreement, the water imported through the Roberts Tunnel under Blue River exchange and substitution operations is a source acquired by Denver after May 1, 1940. Accordingly, the return flows from those operations are not subject to the 1940 Agreement and Denver may reuse or successively use them.

¶75    We disagree with Consolidated Ditches that the so-called "character of exchange rule" requires a different result here. Although we acknowledge that some of our cases have implicitly applied the character of exchange principle to preserve the reusability of transmountain effluent in exchange plans, here, Consolidated Ditches seeks to apply it to render the return flows from imported water non-reusable. And to the extent that Consolidated Ditches seeks application of the character of exchange rule to preserve what it perceives to be a contractual restriction on the Williams Fork Reservoir water, we conclude that the application of the character of exchange principle here is not necessary to fulfill the primary purpose of the 1940 Agreement, which was to replace seepage and evaporation losses from Denver's three streambed reservoirs. As described above, that purpose is already more than met by importations through the Moffat Tunnel of Fraser

River and Williams Fork River water under their 1921 priorities. *See Consolidated Ditches*, 807 P.2d at 36–37. Indeed, applying the principle here would disserve the core purpose of the Agreement's restrictions on reuse, in that it would exacerbate the already growing disparity we acknowledged in *Consolidated Ditches* when we drew the line at sources with appropriation dates before May 1, 1940.

¶76 Consolidated Ditches contends that it does not make sense to "count" Williams Fork Reservoir water for purposes of the 1940 Agreement when it is imported through the Moffat Tunnel, but not when it is imported through the Roberts Tunnel. But this argument again rests on the character of exchange principle; it assumes that the water imported through the Moffat Tunnel through exchange operations on the Williams Fork River or Fraser River takes on the character of the Williams Fork Reservoir substitute supply and that return flows from such water are subject to the 1940 Agreement only by virtue of the Williams Fork Reservoir's 1935 priority date.

¶77 However, our analysis and holding in *Consolidated Ditches* did not hinge on any implicit application of the character of exchange concept. We did not discuss exchange operations using Williams Fork Reservoir water as a substitute supply in that opinion. If anything, our descriptions of the water imported through the Moffat Tunnel (from the Williams Fork River and Fraser River) focused exclusively on the 1921 appropriation dates of those sources. *See id.* at 26. In other words, even to the extent that Moffat Tunnel water discussed in that case included water diverted by exchange (and our opinion is silent on this point), we did not rely on the 1935 appropriation date of the Williams Fork

49

Reservoir substitute supply to conclude that such water was subject to the 1940 Agreement. Nor was it necessary to rely on the character of exchange to conclude that return flows from water imported through the Moffat Tunnel were subject to the 1940 Agreement. Even without applying the character of exchange principle, water imported from the Fraser and Williams Fork River by exchange would be subject to the 1940 Agreement because those sources had appropriation dates prior to May 1, 1940.

¶78 We drew a line in *Consolidated Ditches* at sources with appropriation dates prior to May 1, 1940, recognizing the rough balance achieved by that line. Under the circumstances here, and considering the core purpose of the 1940 Agreement, which is already more than met by importations through the Moffat Tunnel, we decline to apply the character of exchange principle to exacerbate an already growing disparity in Consolidated Ditches' favor that it is reasonable to assume the parties to the Agreement never intended. There is no suggestion that Consolidated Ditches' interests in ensuring the offset of evaporation losses will not be met if Denver is permitted to reuse return flows from the Blue River exchange. To the extent that Consolidated Ditches suggests it will be "injured" by not getting the benefit of its bargain under the Agreement, we again emphasize that the core problem sought to be resolved was the dispute over seepage and evaporation losses. Consolidated Ditches' interests in having those losses fully replaced are protected both by ongoing importations through the Moffat Tunnel, and by the State Engineer's authority to order releases of water from reservoirs to compensate for evaporation losses if necessary. *See* § 37-84-117(5).

¶79 There is also no suggestion that Denver will use the Blue River system exchange to decrease the amount of Fraser River and Williams Fork River water it imports, thereby reducing the amount of water subject to the 1940 agreement. That said, we agree with the water court that the ditch companies may seek relief from the State Engineer and file an appropriate action if they believe that Denver's diversions, or lack of diversions, from certain western slope sources are causing injury to their water rights.

## IV. Conclusion

¶80 We reaffirm that the primary purpose of the 1940 Agreement was to address the problem of evaporation losses resulting from three of Denver's reservoirs on the eastern slope, and that the 1940 Agreement applies only to water rights appropriated by Denver on or before May 1, 1940. Because the water imported through the Roberts Tunnel under Blue River exchange and substitution operations is a source acquired by Denver after May 1, 1940, we conclude that the resulting return flows are not subject to the 1940 Agreement and Denver may reuse and successively use them. Accordingly, we affirm the judgment and decree of the water court.